**Julie A. SHIRKEY, Plaintiff–Appellant,**

v.

**ELI LILLY & COMPANY,
Defendant–Appellee.**

No. 87–2122.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 4, 1988.

Decided July 12, 1988.

As Modified on Denial of Rehearing
Sept. 9, 1988.

Robert L. Elliott, Cook & Franke, S.C., Milwaukee, Wis., for plaintiff-appellant.

Lane D. Bauer, Shook, Hardy & Bacon, Kansas City, Mo., for defendant-appellee.

Before CUDAHY, EASTERBROOK and KANNE, Circuit Judges.

CUDAHY, Circuit Judge.

Julie Shirkey, the plaintiff in this diversity action, appeals from a jury verdict in favor of Eli Lilly & Company ("Lilly"). Shirkey seeks tort damages under both strict liability and negligence theories as compensation for having contracted clear cell adenocarcinoma of the vagina, a cancer that has been linked to *in utero* exposure to synthetic estrogen. Shirkey attributes her illness to her mother's ingestion of diethylstilbestrol ("DES"), a form of synthetic estrogen marketed as a prescription drug for the prevention of miscarriage and other complications of pregnancy by Lilly and other pharmaceutical companies from 1947 through 1972.

The case went to trial on the liability issue alone with damages issues reserved for later resolution. At the conclusion of the evidence, the district judge read separate instructions to the jury pertaining to negligence and strict liability theories. Responding to a series of special interrogatories, the jury found that Shirkey's mother had ingested DES manufactured by Lilly

while pregnant with Julie. The jury also held, however, that Lilly was neither negligent in marketing DES in 1960 nor strictly liable for having marketed a defective product.

On appeal, Shirkey asserts that the district court's jury instructions misstated Wisconsin law. She contends that the district judge should not have instructed the jury that Lilly could be held strictly liable only if it knew or should have known about the dangers of *in utero* exposure to DES. Shirkey also asserts that the district judge's negligence instruction understated Lilly's duty to potential users by directing the jury to consider the reasonableness of Lilly's failure to foresee the specific harm at issue here—cancer in female offspring— rather than the reasonableness of failing to foresee the possibility of some harm to the offspring of pregnant users. Shirkey also contends that the district judge abused his discretion by excluding two bodies of relevant evidence: depositions from an earlier suit against Lilly taken from an expert who was unable to appear at Shirkey's trial and evidence that DES was ineffective in preventing miscarriages.

We find that Shirkey's challenges to the jury instructions raise issues that lack determinate answers under existing Wisconsin case law. We will therefore certify questions concerning Wisconsin's strict liability and negligence law to the Wisconsin Supreme Court under the mechanism provided by Wisconsin law. *See* Wis.Stat. §§ 821.01–.12 (1985–86). Since the relevance of the excluded evidence may depend on the correctness of the legal standard that the district court applied, we defer consideration of the evidentiary questions until the Wisconsin Court either clarifies the legal standard or declines our certification and leaves us to anticipate the development of Wisconsin law as best we can.

## I.

In 1941, the Food and Drug Administration ("FDA") approved DES for the treatment of a number of gynecological problems unrelated to pregnancy and for the suppression of lactation. In 1947, Lilly submitted a supplemental new drug application to obtain authorization to label and advertise DES as useful in preventing "accidents of pregnancy," principally miscarriages. The application was quickly approved and Lilly, soon to be joined by other manufacturers, began marketing DES for use by pregnant women.

Joanne Shirkey became pregnant with Julie in mid–1960. During the first trimester of her pregnancy, Joanne took 142 tablets of DES in accordance with her doctor's instructions. The jury found that these tablets were manufactured by Lilly. In January 1982, at the age of twenty, Julie Shirkey developed a cancerous lesion on her vagina, diagnosed as clear cell adenocarcinoma. She underwent extensive surgery to arrest the disease.

Shirkey's original complaint, filed in March 1984, alleged that Lilly was negligent in manufacturing and marketing DES for use by pregnant women and that DES was unreasonably dangerous. The complaint was later amended to add allegations that by 1960 Lilly knew that the drug was carcinogenic and ineffective in preventing miscarriages.

## II.

The instructions to the jury explained that the strict liability interrogatory would require them to decide

> whether the DES ingested by Joanne Shirkey was in a defective condition when it left the possession of the Eli Lilly Company. A pharmaceutical product such as DES is defective if the manufacturer fails to warn the medical profession of dangers it knows about or with reasonable efforts or investigation should know about in relation to the drug. If it knows or should know that the drug is dangerous for certain uses the failure of a drug company to so warn the medical profession renders the drug defective.

Tr. at 1458.

Shirkey attacks the district court's strict liability instruction on two grounds. First, she contends that the district judge improp-

erly directed the jury to consider Lilly's conduct rather than to focus exclusively on the nature of its product. Second, Shirkey contends that even if Wisconsin sometimes allows defendants' conduct to enter into determinations of strict liability claims, Lilly's conduct is nevertheless irrelevant in this case because DES, as marketed for use by pregnant women, was an "unreasonably dangerous" product for which the producer is strictly liable regardless of what was known or practically knowable at the time it was sold. *See* Restatement (Second) of Torts § 402A comment i (1971). Lilly maintains that Shirkey waived her objections and that the strict liability instruction was, in any event, correct.

## A.

Rule 51 of the Federal Rules of Civil Procedure requires that objections to jury instructions be raised "before the jury retires to consider its verdict, stating distinctly the matter to which [the party] objects and the grounds of his objection." This requirement demands that parties raise all objections at a time when the district court can correct any errors and avoid the delay and expense of appeal and remand. *See Spanish Action Comm. v. City of Chicago*, 766 F.2d 315, 319 (7th Cir.1985); *see also City of Springfield v. Kibbe*, 480 U.S. 257, 107 S.Ct. 1114, 1116, 94 L.Ed.2d 293 (1987) (noting "considerable prudential objection to reversing a judgment because of instructions that the petitioner accepted, and indeed itself requested"). Ordinarily, merely proposing alternative instructions will not satisfy Rule 51; an argument describing the district court's alleged error in rejecting the proposed instruction is generally required. *See, e.g., Schwartz v. American Honda Motor Co.*, 710 F.2d 378, 383–84 (7th Cir.1983).

■ Unusual circumstances place this case outside the usual rule. Here, the district judge indicated that specific objections would be useless, stating that he "in-

tend[ed] to give the instructions as indicated" and assuring the parties that the record was "preserved as to objections to any of the instructions and the verdict insofar as [they] may differ from the requested instruction and verdict form submitted by the parties." Tr. at 1430. The judge did follow this statement with an invitation to the parties "to make further objections to preserve the record," *id.;* and Shirkey did restate some of the objections that were implied by the differences between the instructions she proposed and the instructions given to the jury. Nevertheless, we do not believe that the invitation to state "further objections" revoked or contradicted the judge's initial statement that objections implied by proposed instructions were preserved.

When district judges offer assurances that prior arguments are automatically preserved they tend to frustrate the purposes of Rule 51 by deterring litigants from formally stating their objections to jury instructions. *See Coughlin v. Capitol Cement Co.*, 571 F.2d 290 (5th Cir.1978); 9 C. Wright & A. Miller, *Federal Practice and Procedure* § 2553 at 637 (1971) ("It is certainly undesirable for the court to announce that it is granting an automatic exception to all of its refusals of requests to charge and its grant of the opponent's requests for charge."); *see also United States v. Hollinger*, 553 F.2d 535, 543 (7th Cir.1977) (full opportunity for counsel to make a complete record of objections to the charge must be provided). Although the district judge did not go so far as to prevent Shirkey from raising specific objections, his statements clearly indicated that detailed objections would be useless as a means of changing the jury charge and unnecessary as a means of preserving objections for appeal.[1] Prudent counsel would no doubt have objected formally to the proposed instructions despite the judge's statement. We think that it would be unfair, however, to penalize Shirkey for proceeding in accordance with the district

---

1. In rejecting Shirkey's Motion for a New Trial, the district court addressed the merits of Shirkey's objections to the instructions, but questioned, in passing, "whether a proper objection was made to the instruction as given." No. 84–C–0288, mem. op. at 1 (E.D.Wis. June 17, 1987).

judge's instructions about the preservation of objections. *See Stewart v. Ford Motor Co.,* 553 F.2d 130, 139–40, (D.C. Cir.1977); *Ball v. Delta Marine Drilling Co.,* 476 F.2d 287, 288 (5th Cir.1973); *see also Irvin Jacobs & Co. v. Fidelity & Deposit Co.,* 202 F.2d 794, 800–01 (7th Cir.1953).

### B.

Turning to the merits of Shirkey's attack on the strict liability instruction, we encounter questions for which Wisconsin law provides no definitive answers. Shirkey's first objection—that the jury was impermissibly directed to consider Lilly's conduct rather than the characteristics of its product—rests on a claim that Wisconsin, unlike most jurisdictions that have adopted section 402A, has refused to soften strict liability by using negligence concepts to define product defects. This objection finds some support in certain general statements of the Wisconsin Supreme Court concerning the meaning of strict liability. In *Greiten v. La Dow,* 70 Wis.2d 589, 235 N.W.2d 677 (1975), that court sharply distinguished standards for recovery under strict liability and negligence theories.

> In the *Dippel* [i.e., strict liability] type of case, the burden of proof that the product was in a defective condition at the time it reached the hands of the ultimate consumer is upon the plaintiff; and in the event he meets that burden of proof, there is liability. It is not necessary to show any specific acts of negligence. It is not necessary to show duty in terms of foreseeability. It is enough to prove, irrespective of due care, that, because of its dangerously defective nature, the product caused harm....
>
> ... *Dippel* is based upon the public-policy premise that a seller is socially

responsible for what he puts into the stream of commerce irrespective of his degree of care.

*Id.* at 603–04, 235 N.W.2d at 685–86.[2] Subsequent cases have reaffirmed this distinction, though in somewhat less sweeping terms. *See, e.g., Shawver v. Roberts Corp.,* 90 Wis.2d 672, 682, 280 N.W.2d 226, 231 (1979) ("strict liability in tort focuses, not on the failure to exercise ordinary care, but on whether the seller has marketed a dangerously defective product"); *Howes v. Deere & Co.,* 71 Wis.2d 268, 273, 238 N.W. 2d 76, 79 (1976) ("liability imposed in a [strict liability] case is not based upon a failure to exercise ordinary care with its necessary element of foreseeability"). *But see Chaulk v. Volkswagen of America, Inc.,* 808 F.2d 639, 643 (7th Cir.1986) (Posner, J., dissenting) (Wisconsin recognizes "little if any practical difference between negligence and strict liability in a products liability case complaining about the design of a product"); *Priske v. General Motors Corp.,* 89 Wis.2d 642, 658, 279 N.W.2d 227, 234 (1979) (treating state of the art evidence as relevant to design defect determination).

Wisconsin's reluctance to equate strict products liability with negligent design has also been evident in its wariness toward the comments to section 402A that import negligence principles. When the Wisconsin Supreme Court endorsed the text of section 402A, it expressly declined to accept the accompanying comments. *Dippel v. Sciano,* 37 Wis.2d 443, 459, 155 N.W.2d 55, 63 (1967). While some comments have been expressly adopted in subsequent decisions, others, such as comment j, which requires manufacturers to warn of dangers about which they knew or should have known at the time of production and distribution,[3]

---

2. Justice Heffernan's opinion, in which the quoted language appears, is the majority opinion in *Greiten,* though it is mislabeled as a concurrence. *See Howes v. Deere & Co.,* 71 Wis.2d 268, 274, 238 N.W.2d 76, 80 (1976).

3. The relevant language from comment j provides:

> *j. Directions or warning.* In order to prevent the product from being unreasonably dangerous, the seller may be required to give

directions or warning, on the container, as to its use. ... Where ... the product contains an ingredient to which a substantial number of the population are allergic and the ingredient is one whose danger is not generally known, or if known is one which the consumer would reasonably not expect to find in the product, the seller is required to give warning against it, if he has knowledge, or by the application of reasonable, developed human skill and foresight should have knowledge, of

have not. One appellate court has cited comment j as authority for "shift[ing] the focus back to the seller's conduct in a strict liability case based on a failure to warn," *Krueger v. Tappan Co.*, 104 Wis.2d 199, 207, 311 N.W.2d 219, 223 (Wis.App.1981), but the state Supreme Court has pointedly declined to indicate whether this case was correctly decided. *See D.L. v. Huebner*, 110 Wis.2d 581, 614, 329 N.W.2d 890, 905 (1983). This court has cited *Krueger* as persuasive authority, if not for the adoption of comment j, then at least for a recognition that defendants' conduct can be relevant in duty to warn cases decided under Wisconsin law. *Flaminio v. Honda Motor Co.*, 733 F.2d 463, 466 (7th Cir.1984) (duty to warn arises " 'if the seller has, or should have, knowledge of a dangerous use' ") (quoting *Krueger*, 104 Wis.2d at 206–07, 311 N.W.2d at 223; *see also Gracyalny v. Westinghouse Elec. Corp.*, 723 F.2d 1311, 1317 n. 11 (7th Cir.1983) (same).

Wisconsin has shown this same aversion to the use of negligence standards to define product defects in its refusal to adopt comment k. Comment k protects manufacturers of "unavoidably unsafe" but nevertheless beneficial products (with drugs cited as the leading example), provided that they are accompanied by proper directions and warnings. Most jurisdictions that have adopted section 402A rely on comment k as

authority for applying what is effectively a negligence standard when they assess the adequacy of warnings in cases nominally controlled by strict liability doctrine.[4] *See, e.g., Werner v. Upjohn Co.*, 628 F.2d 848, 858 (4th Cir.1980) (applying Maryland law), *cert. denied*, 449 U.S. 1080, 101 S.Ct. 862, 66 L.Ed.2d 804 (1981); *Brown v. Superior Court*, 44 Cal.3d 1049, 245 Cal.Rptr. 412, 416–19, 751 P.2d 470, 475–77 (1988); *Feldman v. Lederle Laboratories*, 97 N.J. 429, 479 A.2d 374, 385–87 (1984). *But see, e.g., Brochu v. Ortho Pharmaceutical Corp.*, 642 F.2d 652, 655 (1st Cir.1981) (under New Hampshire law drug may be defective due to unreasonable dangerousness, notwithstanding warnings); *Toner v. Lederle Laboratories*, 112 Idaho 328, 732 P.2d 297, 308–09 (1987) (applicability of comment k to ethical drugs to be determined on case-by-case basis, based on factors including whether benefits outweigh risks). Wisconsin, siding with the minority, has evaluated comment k—in a case involving a claim strikingly similar to Shirkey's—and found it to be "too restrictive and, therefore, not commensurate with strict products liability law in Wisconsin." *Collins v. Eli Lilly & Co.*, 116 Wis.2d 166, 197, 342 N.W.2d 37, 52, *cert. denied*, 469 U.S. 826, 105 S.Ct. 107, 83 L.Ed.2d 51 (1984).

the presence of the ingredient and the danger. Likewise in the case of poisonous drugs, or those unduly dangerous for other reasons, warning as to use may be required.

. . . .

Where warning is given, the seller may reasonably assume that it will be read and heeded; and a product bearing such a warning, which is safe for use if it is followed, is not in defection condition, nor is it unreasonably dangerous.

4. Comment k provides:

*k. Unavoidably unsafe products.* There are some products which, in the present state of human knowledge, are quite incapable of being made safe for their intended and ordinary use. These are especially common in the field of drugs. An outstanding example is the vaccine for the Pasteur treatment of rabies, which not uncommonly leads to very serious and damaging consequences when it is injected. Since the disease itself invariably leads to a dreadful death, both the marketing and the use of the vaccine are fully justified, notwithstanding the unavoidable high degree

of risk which they involve. Such a product, properly prepared, and accompanied by proper directions and warning, is not defective, nor is it *unreasonably* dangerous. The same is true of many other drugs, vaccines, and the like, many of which for this very reason cannot legally be sold except to physicians, or under the prescription of a physician. It is also true in particular of many new or experimental drugs as to which, because of lack of time and opportunity for sufficient medical experience, there can be no assurance of safety, or perhaps even of purity of ingredients, but such experience as there is justifies the marketing and use of the drug notwithstanding a medically recognizable risk. The seller of such products, again with the qualification that they are properly prepared and marketed, and proper warning is given, where the situation calls for it, is not to be held to strict liability for unfortunate consequences attending their use, merely because he has undertaken to supply the public with an apparently useful and desirable product, attended with a known but apparently reasonable risk.

*Collins,* however, did not end its discussion of the relevance of conduct with the rejection of comment k. The court went on to recognize that "exigent circumstances," though not demonstrated by Lilly in that case, might sometimes justify a decision to place drugs on the market in advance of thorough testing. By recognizing exigent circumstances as a possible strict liability defense for manufacturers of otherwise defective products, *Collins* appeared to accept the view that the reasonableness of a manufacturer's conduct, assessed against the situation at the time its product is marketed, can sometimes be relevant to a determination whether a product is defective under section 402A. *See also Sumnicht v. Toyota Motor Sales,* 121 Wis.2d 338, 371–75, 360 N.W.2d 2, 17–19 (1984) (applying series of "permissive" factors, including some importing negligence concepts, to determination whether product defective because unreasonably dangerous); *Kozlowski v. John E. Smith's Sons, Inc.,* 87 Wis.2d 882, 275 N.W.2d 915 (1979) (considering effect of knowledge acquired after sale on whether lack of warning rendered product defective). These authorities, contrary to the statement of general principle in *Greiten,* appear to recognize exceptions to Wisconsin's rejection of negligence principles in strict liability cases. Our review of Wisconsin case law therefore leaves us uncertain of the merits of Shirkey's general claim that the ex ante reasonableness of a manufacturer's actions cannot defeat a strict liability claim if the product fails an ex post cost-benefit analysis.

Shirkey's second argument against the strict liability instruction involves a fallback position. She argues that even if the negligence principles set out in the comments to section 402A sometimes control strict liability determinations in Wisconsin, this case should have been presented to the jury under the unreasonably dangerous product theory set out in comment i. Comment j, upon which the district court based its strict liability instruction, allows producers to avoid liability by warning of known and practically knowable dangers posed by products that, on balance, produce more good than harm. Lilly contends that DES was a single product with many useful applications, which, under comment j (assuming that *Krueger* is correct and comment j is valid in Wisconsin), can give rise to liability only if the company failed to disclose known or practically knowable dangers. Shirkey, however, argues that DES should be viewed as two separate products: one reasonably safe and effective drug (DES prescribed for anyone who is not pregnant) and one unreasonably dangerous drug (DES prescribed for the prevention of miscarriages) that no warning could have made safe. In keeping with this theory, Shirkey sought an instruction based on comment i, which characterizes a product as defective if it is "dangerous to an extent beyond which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics." [5]

The Wisconsin Supreme Court has so far declined to provide a comprehensive definition of an unreasonably dangerous product. "Since product defects are unique in each case, the factors that will be beneficial in assessing defectiveness and unreasonableness will differ from case to case." *Sumnicht,* 121 Wis.2d at 371–72, 360 N.W.2d at 17. Arguably, this assessment may, despite Wisconsin's repeated insistence that strict liability focuses on products rather than conduct, take account of the reasonableness of a manufacturer's precautions based on information available at the time. *Id.* at 375, 360 N.W.2d at 19. However, it appears that reasonable conduct will not

---

**5.** The relevant language from comment i provides:

> i. *Unreasonably dangerous.* The rule stated in this Section applies only where the defective condition of the product makes it unreasonably dangerous to the user or consumer. Many products cannot possibly be made entirely safe for all consumption, and any food or drug necessarily involves some risk of harm, if only from over-consumption.... The article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics....

always save a manufacturer from strict liability if, in hindsight, the costs of realized risks outweigh benefits. "A product may be defective and unreasonably dangerous even though there are not alternative, safer designs available." *Id.* at 371, 360 N.W.2d at 17. Failure to warn cases, in contrast, focus on the ex ante feasibility of identifying and warning of future hazards.[6]

Shirkey's position that DES prescribed for pregnant women represents a separate product gains support from the history of DES's marketing for the prevention of miscarriages. When the FDA first approved DES in 1941, the prevention of miscarriages was not among its accepted uses. Section 505(a) of the Federal Food, Drug and Cosmetic Act of 1938[7] prohibited manufacturers from promoting non-approved applications of "new drugs" (a classification which included DES) on labels, in package inserts and in most product advertising. In 1947, Lilly submitted a supplemental New Drug Application to expand the list of approved uses to include the prevention of accidents of pregnancy. The FDA's ap-

proval of this supplemental application paved the way for widespread sales of DES to pregnant women.[8]

Existing case law does not allow us to say with any reasonable degree of confidence whether Wisconsin's courts would treat DES ingested to prevent miscarriages as a separate product from DES prescribed for other uses. If Lilly had marketed DES for pregnant women under a separate brand name, we would have no difficulty concluding that the jury should have been instructed to consider, among other factors, whether, in hindsight, this brand's costs to victims like Shirkey exceeded its benefits. *See Sumnicht,* 121 Wis.2d at 371, 360 N.W.2d at 17. If, on the other hand, the prevention of miscarriages had been among the original uses of DES, some of which proved beneficial and some harmful, there would be some authority for the district court's instruction that Lilly should be held liable only for failing to warn of dangers that were known or practically

6. The district court's exclusion of evidence on the efficacy of DES in preventing miscarriage was consistent with its reliance on the ex ante view of defectiveness. The drug's ultimate effectiveness in preventing the accidents of pregnancy is irrelevant if strict liability turns solely on the reasonableness of Lilly's failure to anticipate and disclose the dangers that DES posed to pregnant women and their offspring. It is, of course, critical if the jury is asked to consider also whether DES was unreasonably dangerous in hindsight.

7. 52 Stat. 1052, *as amended,* 21 U.S.C. § 355(a) (1982). "New drugs" were drugs first marketed after 1938 and not generally recognized "as safe for use under the conditions prescribed, recommended, or suggested in the labeling thereof." Federal Food, Drug and Cosmetic Act ("FDCA"), ch. 675, § 201(p)(1), 52 Stat. 1041, *as amended,* 21 U.S.C. § 321(p)(1) (1982). Prior to the amendments of 1962, "advertising" of new drugs —as distinct from "labeling"—was regulated by the Federal Trade Commission under section 4 of the Federal Trade Commission Act of 1938. 52 Stat. 114, *as amended,* 15 U.S.C. § 52 (1982). Labeling, however, was construed broadly to include promotional and informational material such as product inserts and brochures distributed to doctors. Recommending new drugs for applications not covered by an effective New Drug Application constituted a violation of section 505(a) of the FDCA, 52 Stat. 1053, *as amended,* 21 U.S.C. § 355(a) (1982). The FDA's

enforcement tools included injunctions, criminal penalties and seizure actions as set forth in sections 302–304. 52 Stat. 1043–1044, *as amended,* 21 U.S.C. §§ 332–334 (1982). For a general description of the statutory mechanism for approving new drugs prior to 1962, see Note, *Drug Efficiency and the 1962 Drug Amendments,* 60 Geo. L.J. 185, 187–91 (1971).

8. The supplemental application was needed to authorize broader marketing efforts rather than new uses per se. Prior to 1947, doctors probably could have prescribed DES for pregnant women without running afoul of the FDA. In 1972, the FDA published the following statement indicating its lack of authority under the 1938 Act to control the prescription of approved drugs for unapproved uses:

> Once the new drug is in a local pharmacy, ... the physician may ... lawfully prescribe a different dosage ... or may otherwise vary the conditions of use from those approved in the package insert, without informing or obtaining the approval of the Food and Drug Administration.

Notice of Proposed Rulemaking, Legal Status of Approved Labeling for Prescription Drugs; Prescribing for Uses Unapproved by the Food and Drug Administration, 37 Fed. Reg. 16,503 (1972) (quoted in Shapiro, *Limiting Physician Freedom to Prescribe a Drug for Any Purpose: The Need for FDA Regulation,* 73 Nw. U.L.Rev. 801, 808 (1979)).

knowable ex ante.[9] *See Flaminio*, 733 F.2d at 466; *Krueger*, 104 Wis.2d at 206–07, 311 N.W.2d at 233. Shirkey, however, presents us with an intermediate case: a heavily regulated product sold initially for one set of beneficial applications but later made available for different applications, alleged to be unreasonably dangerous, through the efforts of producers to expand the market. Neither the parties' nor our own research has revealed clear authority in Wisconsin for resolving this intermediate case.[10]

The indeterminacy of these central issues concerning the validity of the strict liability instruction in this case warrants certification of these questions to the Wisconsin Supreme Court. Circuit Rule 52 authorizes us to certify dispositive questions of state law to the courts of states that entertain such requests; and Wisconsin law permits the state's Supreme Court to answer questions certified by this court. Wis.Stat. §§ 821.01–.12 (1985–86). Because this is one of the unusual cases in which existing state authorities leave us without adequate guidance, *see Kuba v. Ristow Trucking Co.*, 811 F.2d 1053 (7th Cir.1987), we will certify the questions raised by Shirkey's strict liability objections to the Wisconsin Supreme Court.

### III.

Shirkey also contends that the district court's negligence instruction described Lilly's duty too narrowly. The relevant portion of the district court's negligence instruction stated

Under the facts of this case the Lilly Company as a manufacturer of drugs had a duty to exercise ordinary care to warn the medical profession of dangers which it knew or should have known to be associated with the proper use of DES. Whether Lilly was negligent depends on what Lilly knew or should reasonably have known in 1960. Lilly can be found to be negligent if you are satisfied that it knew or should reasonably [have] known in 1960 that DES could cause cancer in the female offspring of women who took it during pregnancy.

If Lilly knew or should have known of this danger then it had a duty to warn physicians who might prescribe the drug for patient[s] of the possible dangers.

Tr. at 1457–58.

Shirkey objected to the district court's focusing the jury's attention on the foreseeability of the specific injury that materialized in this case, cancer in the daughter of a woman who took DES during pregnancy. Shirkey's alternative instruction would have directed the jury to find Lilly negligent if it acted or failed to act "under circumstances in which a person of ordinary intelligence and prudence ought reasonably to foresee that such act or omission will subject the person of another to an unreasonable risk of injury." Plaintiff's Requested Negligence Instructions, Appellant's Appendix at 145.

**9.** For an analysis and critique of comment k's reliance on ex ante assessments of "unavoidable risks," see Page, *Generic Product Risks: The Case Against Comment k and for Strict Tort Liability*, 58 N.Y.U. L.Rev. 853 (1983).

**10.** Lilly contends that this court's interpretation of the comments to section 402A in *Needham v. White Laboratories, Inc.*, 639 F.2d 394 (7th Cir.), *cert. denied*, 454 U.S. 927, 102 S.Ct. 427, 70 L.Ed.2d 237 (1981), defeats Shirkey's claim. In *Needham*, the district court, applying Illinois' strict liability law to a DES claim similar to Shirkey's, instructed the jury to find the drug manufacturer strictly liable if the manufacturer knew or should have known about the danger of cancer in female offspring (thus giving rise to liability under comment j), *or* if the drug was ineffective and hence unreasonably dangerous (thus defeating the manufacturer's warning defense under comment k). *Id.* at 402 & n. 9. This court reversed on the grounds that com-

ment k, read literally, applied only if some warning had been given. We determined that if the manufacturer had failed to provide any warning, a plaintiff could not invoke the comment k unreasonably dangerous product approach. We therefore held that Illinois courts would rely on comment j, which determines liability based on the reasonableness of the failure to warn without regard to the balance of risks and benefits. *Id.* at 402.

This literal reading of the comments to section 402A was rooted in Illinois case law. It sheds little light on the law of Wisconsin, which contains, at most, a weak endorsement of comment j, *see Huebner*, 110 Wis.2d at 614, 329 N.W.2d at 905 (declining to approve or reject lower court decision that endorsed comment j), and at least a strong suggestion that comment k's defense for useful but unavoidably unsafe products defines the duties of product manufacturers too narrowly, *Collins*, 116 Wis.2d at 197, 342 N.W.2d at 52.

Shirkey's objection relies on the Wisconsin Supreme Court's discussion of proximate cause in *A.E. Investment Corp. v. Link Builders*, 62 Wis.2d 479, 214 N.W.2d 764 (1974). Rejecting a builder's argument that it could only be held liable for direct injuries suffered by a plaintiff who could show privity of contract with the builder, *A.E. Investment* held that negligence lies when, due to a defendant's actions, "some harm to someone is foreseeable." *Id.* at 484, 214 N.W.2d at 766; *accord Schilling v. Stockel*, 26 Wis.2d 525, 531, 133 N.W.2d 335, 338 (1965) ("[O]nce an act has been found to be negligent, we no longer look to see if there was a duty to the one who was in fact injured."). The court expressly rejected a text cherished by law students everywhere—Justice Cardozo's opinion for the majority in *Palsgraf v. Long Island R.R. Co.*, 248 N.Y. 339, 162 N.E. 99 (1928). Instead the Wisconsin court embraced the position that once negligence is established, defendants are liable for "unforeseeable consequences as well as foreseeable ones" and to "unforeseeable plaintiffs" as well as foreseeable ones. *A.E. Investment*, 62 Wis.2d at 484, 214 N.W.2d at 766. Shirkey contends that the district court's negligence instruction ignored *A.E. Investment* and its progeny by instructing the jury that Lilly was negligent only if it should reasonably have foreseen a narrow class of harms, cancers, to a narrow class of victims, "female offspring of women who took [DES] during pregnancy."

■ Lilly's first response is that Shirkey waived any argument for having the jury consider Lilly's care with respect to harms not attributable to *in utero* exposure. In her amended complaint, Shirkey appeared to accept that only dangers associated with *in utero* exposure were relevant to this case. See Plaintiff's Amended Complaint para. 2 ("Lilly knew or should have known that the exposure to DES *in utero* may have carcinogenic effects."). In addition, a pretrial brief argued that Lilly should have foreseen "the broad range of cancers and other abnormalities that could be caused by *in utero* exposure to DES." Plaintiff's Brief in Opposition to Motion to Exclude Evidence at 6. According to Lilly, these

statements preclude Shirkey from arguing now that a proper instruction would have defined Lilly's duty of care to require the prevention of foreseeable harms to mothers as well as children.

Shirkey's statement of objections immediately preceding the reading of the jury instructions completely answers Lilly's waiver argument. Although the district court had assured the parties that any objections implied by differences between their proffered instructions and the instructions actually given to the jury were preserved, Shirkey's counsel nevertheless expressly objected to the narrowness of the class of harms identified in the negligence instruction. Specifically, Shirkey's counsel argued that under *A.E. Investment* "[i]t is ... sufficient that the defendant be aware, know or should know that a risk of some injury was being [in]curred." Tr. at 1433. This objection was consistent with Shirkey's introduction of evidence that there were indications prior to 1960 that DES passed through the placenta and might therefore affect fetal development, *see, e.g.*, tr. at 394–95 (testimony of Dr. Shann Swann), and that DES might have other adverse effects, *see, e.g.*, tr. at 630–31 (testimony of Dr. David Decker, plaintiff's cross examination on cervical cancer in mice). Shirkey's objection to the negligence instruction adequately preserved her argument that the jury should have been directed to consider this evidence in determining whether Lilly was negligent.

■ Lilly defends the district judge's negligence instruction on the merits as a faithful rendition of Wisconsin case law on causation. Lilly maintains that the reference to the foreseeability of cancer in female offspring should be read as an illustration of the type of harm that a drug company might reasonably be required to foresee, rather than as an indication that to find Lilly negligent the jury had to conclude that the company should have anticipated the precise harm that DES was eventually found to cause.

We find this defense of the negligence instruction unpersuasive. The instruction given may not entirely have ruled out a standard of foreseeability that embraced

other dangers (although the reference to "*this* danger" comes close); but it certainly did not identify cancer in female offspring as a mere example of the kind of harms that Lilly was obliged to foresee. Taken in context the reference to cancer in female offspring seems more likely to have been interpreted by jurors as limiting than as illustrative.

 Lilly also contends that even if the negligence instruction focused the jury's attention on whether Lilly could have foreseen the specific harms now attributed to DES, it was consistent with a limiting principle set forth in *A.E. Investment.* While rejecting *Palsgraf's* insistence that the plaintiff be a foreseeable victim, *A.E. Investment* stressed that a defendant's negligence must still be the cause in fact of the plaintiff's injury. To give rise to liability in negligence, the harm complained of must proceed, " 'in unbroken sequence, without an intervening efficient cause, from the original negligent act.' " 62 Wis.2d at 485, 214 N.W.2d at 767 (quoting *Klassa v. Milwaukee Gas Light Co.*, 273 Wis. 176, 182, 77 N.W.2d 397, 401 (1956)). *Compare Leadfree Enters. v. United States Steel Corp.*, 711 F.2d 805, 807 (7th Cir.1983) (necessary causal connection present in bridge users' suit against construction company and steel maker for inconvenience suffered due to avoidable structural repairs). Lilly maintains that Shirkey has identified only one act or omission on its part with the requisite causal connection to her injury: Lilly's failure to warn that DES could cause cancer to female offspring exposed *in utero.* Any other acts or omissions in the manufacture and marketing of DES were therefore irrelevant to Shirkey's negligence claim, and there was no error in excluding them from the instruction.

This defense of the negligence instruction misapplies Wisconsin's unbroken sequence requirement. At trial, Shirkey introduced animal studies of the effects of synthetic estrogen that appeared in the scientific literature in the 1930's and 1940's. These studies, according to Shirkey, implicated synthetic estrogen as a potential carcinogen. Additional evidence tended to support the claim that scientists were aware of the potential for adverse *in utero* effects well before Shirkey's exposure occurred. If the jury had been instructed to consider Lilly's approach to the entire range of potential harms, and had agreed with Shirkey's argument that the early studies provided notice of the potential for serious harm, it could certainly have concluded that Lilly was negligent not to investigate the harmful side effects of DES more aggressively or to cease marketing DES for use during pregnancy until questions raised by the studies were resolved. Viewed in this light, Lilly's failure to act on available knowledge about DES could be found to have led "in unbroken sequence" to Shirkey's injury.

 Our rejection of Lilly's defenses of the negligence instruction, however, does not compel a conclusion that the negligence count must be retried. Under Wisconsin law, a negligent defendant may still escape liability for reasons of public policy. *Hartridge v. State Farm Mutual Automobile Insurance Co.*, 86 Wis.2d 1, 271 N.W.2d 598 (1978), listed six possible public policy justifications for insulating negligent defendants from liability:

> [E]ven when the chain of causation is complete and direct, recovery may sometimes be denied on grounds of public policy because: (1) The injury is too remote from the negligence; or (2) the injury is too wholly out of proportion to the culpability of the negligent tort-feasor; or (3) in retrospect it appears too highly extraordinary that the negligence should have brought about the harm; or (4) because allowances of recovery would place too unreasonable a burden on the negligent tort-feasor; or (5) because allowance of recovery would be too likely to open the way for fraudulent claims; or (6) allowance of recovery would enter a field that has no sensible or just stopping point.

*Id.* at 12, 271 N.W.2d at 603 (1978) (quoting *Coffey v. City of Milwaukee*, 74 Wis.2d 526, 547, 247 N.W.2d 132, 140 (1976)); *see Leadfree*, 711 F.2d at 807; *Morgan v. Pennsylvania General Ins. Co.*, 87 Wis.2d 723, 737-38, 275 N.W.2d 660, 667 (1979). Whether a negligent defendant should be

protected from liability for any of these reasons of policy is a question of law left solely to the judge. Ordinarily, this determination follows the trial on the negligence issue, after a "full factual presentation" has clarified the relevant public policy considerations. *Morgan*, 87 Wis.2d at 738, 275 N.W.2d at 667.

The district judge in this case did not consider whether any of these policies might justify insulating Lilly from a jury's negligence judgment because the jury, applying an erroneous statement of Wisconsin's negligence standard, found that Lilly was not negligent. We would nevertheless affirm the rejection of Shirkey's negligence claim if, as a matter of law, public policy considerations precluded the imposition of liability on a negligence theory. Two of the enumerated policy justifications could preclude liability in this case: remoteness of the injury from the negligence (a policy concern to which the district judge alluded in explaining the negligence instruction) and the importance of avoiding a "field in which there is no sensible or just stopping point." *Collins*, by condemning the actions of the DES manufacturers and reformulating Wisconsin's rules of causation to allow suits by plaintiffs who could not identify the brand of DES to which they were exposed, suggests that Wisconsin's public policies do not support the protection of negligent defendants in this area. 116 Wis.2d at 182, 197, 342 N.W.2d at 45, 52. But *Collins*, which reversed summary judgment for the defendant on the basis of causation, did not expressly address possible justifications for insulating drug companies from negligence judgments. Indeed, *Morgan* tells us that this analysis would have been premature at the summary judgment stage. Moreover, the district court's concerns about the effects of holding drug companies liable for the remote

consequences of negligent testing practices are not without force. We are reluctant to conclude from *Collins*, which reversed a summary judgment order for the defendants entered before a trial had been held to bring out the facts underlying the negligence claims, that limiting liability for negligence would be inappropriate here.[11] Cases that apply Wisconsin's policy justifications for limiting liability in other contexts provide no firmer footing for a decision in this case. *Compare, e.g., Leadfree Enters. v. United States Steel Corp.*, 711 F.2d 805 (7th Cir.1983) (bridge users cannot recover from negligent construction firm and steel manufacturer), and *Olsen v. Copeland*, 90 Wis.2d 483, 280 N.W.2d 178 (1979) (negligent tavern owner not liable to victim in accident caused by drunken patron) *with La Fleur v. Mosher*, 109 Wis.2d 112, 325 N.W.2d 314 (1982) (no policies preclude liability for negligent infliction of emotional distress caused by confinement), and *Stewart v. Wulf*, 85 Wis.2d 461, 271 N.W.2d 79 (1978) (no public policies preclude liability of host to guest injured while playing with host's gun). We will therefore certify this question as well to the Wisconsin Supreme Court.

### IV.

For the foregoing reasons we find that this case presents questions appropriate for certification to the Wisconsin Supreme Court. We respectfully request that the Supreme Court of Wisconsin answer the following questions of law:

1. Can the reasonableness of a prescription drug manufacturer's decision to produce and market a drug, assessed on the basis of information that was available at the time that decision was made, establish that a drug is not defective under Wisconsin's law of strict liability?

2. Assuming that ex ante reasonableness can be relevant to whether a drug is

---

11. For similar reasons, we reject Shirkey's further claim that *Collins* establishes, as a matter of law, that DES manufacturers were negligent to market the drug for use during pregnancy. The Wisconsin Supreme Court stated that it found "no exigent circumstances which would excuse DES producers or marketers from adequately testing DES before it was placed on the market." 116 Wis.2d at 197, 342 N.W.2d at 52. This statement about the failure to test DES, how-

ever, was made in support of the court's rejection of the warning defense to strict liability for unavoidably unsafe products set forth in comment k to section 402A. We agree with the district court that this observation, appearing in a decision concerned with proof of causation by plaintiffs unable to trace the fungible product they used to a particular manufacturer, cannot be given preclusive effect on the question of negligence.

defective, as suggested by comment j to section 402A of the Second Restatement, does the filing of a supplemental new drug application create a separate product for purposes of determining whether comment i or comment j controls?

3. Do Wisconsin's public policies require courts to protect DES manufacturers from negligence judgments awarded under a failure to warn theory, where the evidence demonstrates only that the manufacturer responded negligently to information suggesting the potential for injuries different from the injury suffered by the plaintiff?

QUESTIONS CERTIFIED.