Ronald D. DAWSON, Plaintiff–Appellee,

v.

NEW YORK LIFE INSURANCE COM-
PANY and NYLIFE Securities, Inc.,
Defendants–Appellants.

No. 96–4226.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 22, 1997.

Decided Feb. 6, 1998.

Rehearing and Suggestion for Rehearing
En Banc Denied March 18, 1998.

Thomas P. Sullivan (argued), Russell J. Hoover, Thomas S. O'Neill, Jenner & Block, Chicago, IL, Sherwin H. Leff, Leff, Cohen & Rosenberg, Ltd., Chicago, IL, for Plaintiff–Appellee.

James L. Thompson, Jenner & Block, Chicago, IL, Dan K. Webb, Lawrence R. Desideri, Winston & Strawn, Chicago, IL, James A. Klenk, Sonnenschein, Nath & Trosenthal, Chicago, IL, Edwin G. Schallert, Debevoise & Plimpton, New York City, for Defendants–Appellants.

Philip C. Stahl, Christopher B. Wilson, Lisa L. Ash, Grippo & Elden, Chicago, IL, for Amicus Curiae American Council of Life Insurance.

Stuart J. Kaswell, Securities Industry Association, Washington, DC, for Amicus Curiae Securities Industry Association.

T.G. Gallery, Washington, DC, for Amicus Curiae National Association of Securities Dealers, Incorporated.

Before CUDAHY, KANNE, and DIANE P. WOOD, Circuit Judges.

KANNE, Circuit Judge.

Ronald Dawson sued New York Life Insurance Company and NYLIFE Securities, Inc. (collectively "New York Life") for defamation resulting from statements made on forms New York Life filed with the National Association of Securities Dealers ("NASD") and oral statements New York Life officers made at a company meeting. The case proceeded to trial, and a jury awarded Dawson $1,300,000 in compensatory damages and $5,000,000 in punitive damages. New York Life appeals, questioning some of the jury instructions used and asserting immunity from defamation suits. Because certain jury instructions were erroneous, we reverse and remand for a new trial.

## I. History

For a very detailed description of the facts leading up to this appeal, see the district court's thorough opinion on New York Life's motion for summary judgment. *Dawson v. New York Life Ins. Co.*, 932 F.Supp. 1509 (N.D.Ill.1996). We recount the facts that are most relevant to this appeal.

Ronald Dawson started working as an insurance agent with New York Life in 1974. His excellent performance earned him several promotions until ultimately he became the General Manager of New York Life's branch office in Corpus Christi, Texas. He continued to please his supervisors who showered him with recognition, financial rewards, and additional responsibility. He ascended through the company until he left the Corpus Christi office in September 1989 to head the Oak Brook, Illinois office.

In March 1989, Ramiro and Lamar Hernandez came into $333,000 and decided to purchase life insurance and an annuity from

New York Life in Corpus Christi. Unfortunately, they met an unsavory character there. Oscar Herrera, an insurance agent in the Corpus Christi office, altered the Hernandezes' life insurance application by adding a zero to increase the value of the policy from $100,000 to $1,000,000, thereby substantially increasing Herrera's commission as well as the premiums due. Herrera falsified paperwork and signatures to withdraw money from the Hernandezes' annuity to pay the higher premiums.

In October 1990, Ramiro Hernandez died and Lamar asked for a withdrawal from her annuity to pay funeral expenses and her living expenses. Rather than tell Lamar that he had fraudulently depleted her annuity, Herrera forged paperwork to withdraw money from another customer's annuity and gave it to Lamar.

The game was up. Lamar discovered the fraud when she received a premium notice that showed the value of her policy at $1,000,000 rather than $100,000. Lamar sued New York Life and Herrera in Texas state court, and in 1993 she won $65,000 in compensatory damages and $15 million in punitive damages. Much of the testimony in that case indirectly implicated the management in the Corpus Christi office, including Dawson. Herrera testified that "windowing" signatures (holding them up to a window and tracing them onto another piece of paper) was common and done with the knowledge of management. Herrera also testified that management was aware of and encouraged agents to convert policies, reassuring agents that if they were caught they could simply apologize for a clerical error and restore the customer's policies. Other agents testified that management had a loose attitude towards fraud and deceitful practices. The only testimony that linked Dawson directly to fraudulent activity indicated that Dawson directed agents to share their commissions so underperforming agents could be eligible for some of New York Life's benefits and incentives.

The verdict in Corpus Christi reverberated in New York Life offices around the country. The home office intensely followed the trial. Immediately after the verdict, top New York Life officials met to decide on a national corporate response. First, they fired Dawson. Next, they prepared comments for the upcoming meeting of all New York Life office managers. At that meeting, New York Life's general counsel Alice Kane elaborated on "a pattern of unethical behavior in the Corpus Christi office." She referred to the previous management without naming Dawson. Other top officials from New York Life gave speeches or participated in panel discussions which similarly referred to unethical or illegal conduct in Corpus Christi without naming Dawson directly. Because of the publicity the case had received, the audience knew the officials were talking about Dawson. Parts of the managers' meeting speeches and presentations were videotaped and mailed around the country for training agents and employees. The videotape contained some remarks that referred indirectly to Dawson.

Immediately after firing Dawson, New York Life filed a required document with the NASD called a Form U–5. Any dealer in securities who is a member of the NASD must file a Form U–5 whenever a registered agent leaves the firm for any reason. In the space on the Form U–5 asking the reason for the termination, New York Life answered, "Failure to follow rules and procedures of New York Life Insurance Company. No securities involved." Shortly thereafter, New York Life received two demand letters from the lawyer who had tried the case in Texas for Lamar Hernandez. The letters alleged that agents in the Corpus Christi office had fraudulently converted his clients' term life insurance policies. After deciding that these letters constituted customer complaints, New York Life filed a first amended Form U–5 indicating that Dawson was the subject of a customer complaint. In the space on the accompanying Disclosure Reporting Page ("DRP–5") asking for the allegations against the agent, New York Life answered, "Allegedly condoned forgery of customer's name to pay $300 premium needed to convert term insurance policy to whole life and condoned other alleged forgeries. Allegedly informed person who committed the forgery in the Cruz matter that if detected they would not be reported to proper authorities." New York Life settled the two new customer complaints and amended Daw-

son's Form U–5 to reflect this fact. New York Life attached copies of the pleadings and settlement agreements to this second amended Form U–5. Simultaneously, New York Life filed a third amended Form U–5 to inform the NASD that yet another customer had filed a complaint in Texas state court against the Corpus Christi office arising out of agent Herrera's fraudulent behavior and Dawson's supervision.

On December 5, 1994, the NASD contacted Dawson and told him that they had investigated the circumstances described in the Forms U–5 (but not those in the last Form U–5 alleging more misconduct by Herrera and Dawson) and determined that they would not take any action against him.

Dawson sued New York Life in the Northern District of Illinois. His complaint alleged defamation based on the statements made on the Forms U–5 and accompanying Forms DRP–5, defamation based on New York Life officials' statements at the managers' meeting, defamation based on the republication by videotape, and intentional infliction of emotional distress. The case was tried to a jury for one month. The jury awarded no damages for defamation by videotape or intentional infliction of emotional distress. The jury awarded $200,000 for defamation based on the first amended Form U–5, $100,000 for defamation based on the second amended Form U–5, and $1,000,000 based on defamation at the managers' meeting. The jury also awarded $5,000,000 in punitive damages not attributable to any particular count. New York Life appeals to this Court.

## II. ANALYSIS

New York Life raises several issues on appeal. We address three that dispose of this appeal completely. Before analyzing these questions, we will put them into context by giving an overview of the legal issues involved in this case.

■ In Illinois, a plaintiff can prevail on a defamation claim by showing that the defendant acted negligently in making the defamatory statement. *See Kuwik v. Starmark Star Mktg. & Admin., Inc.*, 156 Ill.2d 16, 188 Ill.Dec. 765, 769, 619 N.E.2d 129, 133 (1993). However, in this case the district court decided as a matter of law that all of the statements at issue (the Forms U–5 and accompaniments and the managers' meeting statements) enjoy the protection of a qualified privilege. That is, so long as New York Life made these statements for legitimate reasons, Dawson had to prove that New York Life acted recklessly, not just negligently. *See id.* (adopting Restatement (Second) of Torts §§ 593–99). New York Life challenges the district court's decision that the statements were qualifiedly privileged, asserting instead that the statements enjoyed an absolute privilege.

To reflect its determination that all the statements at issue enjoyed a qualified privilege, the district court instructed the jury that Dawson could win only if he proved that New York Life acted with reckless disregard of his rights. The district court had also decided that NASD rules were relevant to determining whether New York Life defamed Dawson by filing the various forms. Consequently, the district court instructed the jury that they could consider NASD rules in deciding whether New York Life had acted recklessly in making statements on the Forms U–5 and DRP–5. New York Life challenges these instructions.

### A. Absolute or Qualified Privilege

■ The central question around which all other issues revolve is whether an absolute privilege or a qualified privilege protects the statements that New York Life made on the NASD forms. The parties agree that the statements are protected by at least a qualified privilege. Dawson asserts that the statements are entitled to only a qualified privilege, meaning that New York Life enjoys immunity from a defamation suit unless it made the statements recklessly. New York Life asserts that the statements are protected by an absolute privilege, and it is therefore immune from suit for defamation even if it acted maliciously, deceitfully, or downright fraudulently. Illinois law governs this question, but no case is directly in point. We conclude that Illinois' highest court would hold the statements protected by a qualified privilege.

New York Life argues that it was under a legal duty to report the customer complaints; therefore, it should be shielded from defamation suits by an absolute privilege to make the report. After all, the law should not force one to choose between being disciplined for failing to fulfill a legal duty or being sued for fulfilling it. New York Life relies on several authorities. First is the Restatement (Second) of Torts § 592A, which says that, "One who is required by law to publish defamatory matter is absolutely privileged to publish it." Second, New York Life relies on *Weber v. Cueto*, 209 Ill.App.3d 936, 154 Ill. Dec. 513, 518, 568 N.E.2d 513, 518 (5th Dist. 1991), for the same proposition. And finally New York Life urges us that customer complaints on Forms U–5 deserve an absolute privilege for various policy reasons.

Dawson counters that a qualified privilege suffices to protect firms from defamation suits: The NASD does not force brokerage firms to choose between NASD discipline or exposure to defamation suits so long as firms exercise reasonable care in the wording of the customer complaints on Forms U5. Second, he points out that the Illinois Supreme Court has held that a legal duty to publish defamatory material gives rise to a qualified privilege, not an absolute one. *See Kuwik*, 188 Ill.Dec. at 769, 619 N.E.2d at 133. Lastly, Dawson argues that an absolute privilege will invite vindictive brokerage firms to embellish customer complaints so as to harm the reputations of agents who have fallen into disfavor.

Illinois law does not directly answer the issue we have before us; our best guides are the opinions in *Weber* and *Kuwik*. In *Weber*, the Illinois Appellate Court held that an attorney's defamatory letters to various government bodies reporting misconduct by another attorney were entitled to an absolute privilege because of "the mandatory nature of the duty to report." *Weber*, 154 Ill.Dec. at 519, 568 N.E.2d at 519. Two years later, however, the Supreme Court of Illinois held that an insurer who sent a letter to the insured defaming her doctor was entitled to only a qualified privilege. *See Kuwik*, 188 Ill.Dec. 765, 619 N.E.2d at 135. That court, like the *Weber* court, recognized that the letter was sent because of a "legal duty," but *Kuwik* did not cite to *Weber* or any other

cases on absolute privilege. Because *Kuwik* is a case from Illinois' highest court, it is the law of Illinois. Our inquiry does not end there however because *Kuwik* is not directly on point, and Illinois has not addressed the issue of NASD forms and the duty to disclose customer complaints. Having no direct authority from Illinois, we will look to decisions from other jurisdictions for guidance.

This Court has already addressed a slightly different question of defamation, the Form U–5, and Illinois law. In *Baravati v. Josephthal, Lyon & Ross, Inc.*, 28 F.3d 704, 705 (7th Cir.1994), a brokerage firm fired one of its agents. As required by the NASD, the firm filled out a Form U–5 giving the reason for termination as "under investigation by [the firm] for the fraudulent and wrongful taking of firm property in the amount of $7,650.25." *See id.* In the ensuing defamation suit, the firm argued that the Form U–5 was part of a quasi-judicial proceeding, like a pleading, thus protected by an absolute privilege. *See id.* at 706–07. We rejected this argument, noting that although some NASD functions could be fairly described as quasi-judicial, "the submission of a U–5 form and its transmission (upon request) to members of the NASD are not stages in the association's quasi-judicial regulatory process." *Id.* at 708. We held that under Illinois law an employer enjoys a qualified privilege to describe the reasons for terminating an agent to the NASD. That holding agrees with the holdings of most other courts that have addressed the issue, although each interpreted the defamation law of a different state. *See Glennon v. Dean Witter Reynolds, Inc.*, 83 F.3d 132, 137 (6th Cir.1996) (applying Tennessee law); *Fahnestock & Co. v. Waltman*, 935 F.2d 512, 515 (2d Cir.1991) (applying New York law); *see also Eaton Vance Distribs. v. Ulrich*, 692 So.2d 915, 916 (Fla.Dist. Ct.App.), *review denied*, 705 So.2d 8 (Fla. 1997); *but see Culver v. Merrill Lynch & Co.*, No. 94 Civ. 8124 (LBS), 1995 WL 422203 (S.D.N.Y. July 17, 1995) (applying New York law and holding termination notices on Forms U–5 protected by absolute privilege).

*Baravati* addressed termination notices; it did not cover the question of employers who

report customer complaints about an agent on the Form U–5, and our research reveals only one other court that has. In *Prudential Securities, Inc. v. Dalton*, 929 F.Supp. 1411 (N.D.Okla.1996), an agent voluntarily left his firm. His former employer filled out a Form U–5 and indicated in the area for customer complaints, "Claimant alleged unsuitability in connection with investments in limited partnerships. Alleged damages in excess of $10,-000." *Id.* at 1413. The firm also checked the box on the Form U–5 indicating that the customer complaint "was settled or decided against the individual (Dalton) for $5,000.00 or more, or found fraud or the wrongful taking of property." *Id.* The agent sued for defamation, alleging that the statements were misleading and that the firm made them to deflect blame from itself onto him. *See id.* at 1416. The firm argued that the statements were absolutely privileged, *see id.* at 1418, but the court simultaneously adopted and expanded *Baravati* to hold that customer complaints are entitled only to a qualified privilege. *See id.*

In our attempt to determine what an Illinois court would do, we review policies implicated by this case.[1] Firms that deal in securities are under substantial pressure to repeat customer complaints on Forms U–5. First of all, NASD rules require them to do so. Second, firms face the possibility of lawsuits from other firms if they fail to report accurately the customer complaints against their former agents. If the terminating employer fails to repeat customer complaints on the Form U–5, another firm that subsequently hires the agent will not know that the agent has a history of complaints. If the agent puts his new firm in jeopardy through fraudulent dealings or other malpractice, his new firm may sue the old one for failing to put the world on notice that the agent has a history of problems. Thus, a firm's best chance to avoid liability to other firms is to report accurately and thoroughly any customer complaints against that agent. However, despite this pressure to report customer complaints, firms are also under pressure *not* to report them because of the possibility of defamation suits like this one

and the punitive damages that may result. Thus, New York Life argues that firms should enjoy the protection of an absolute privilege to repeat customer complaints on Forms U–5.

Firms are not the only interested parties to this issue, however. Agents are keenly aware that firms have control over the wording of customer complaints and the potential for damage to their professional reputations caused by entries on Forms U–5. This is of particular concern to the agent about whom customers make meritless complaints and to the agent who may serve as a scapegoat when a firm faces attacks for poor investment choices or charges of unethical or illegal dealing. An agent who is looking for a new job has an interest in his former employer reporting only the unelaborated truth of what customers have said about him. Any embellishment or exaggeration can only damage the agent's professional reputation and make the job hunt more difficult.

We think wiser policy leads to the conclusion that a qualified privilege adequately protects the interests of all parties concerned. Brokerage firms remain free to satisfy their obligations to the NASD by reporting customer complaints accurately. So long as the restatement of the customer's grievance remains true to the complaint the firm received, there is little danger of a successful defamation suit. And while even meritless complaints against agents must be reported on Forms U–5, individual agents can rest assured that securities firms do not have free rein to report customer complaints in any way they like, exaggerating complaints or inventing them wholesale with absolute immunity to do so. Firms must fill out Forms U–5 using plain language that restates the complaint accurately. Therefore, we think the Illinois Supreme Court would hold that customer complaints reported on Forms U–5 are protected by a qualified privilege, not an absolute one. The district court correctly held that the statements at issue are protected by a qualified privilege, and it correctly

---

1. For an excellent overview of Forms U–5, the policies behind them, and the risks that employers and agents face, see Anne H. Wright, *Form*  *U–5 Defamation*, 52 Wash. & Lee L.Rev. 1299 (1995).

proceeded to give jury instructions based on recklessness, not negligence.

## B. Jury Instructions Standard

■ New York Life challenges two of the jury instructions that the district court gave the jury: the instruction concerning "reckless disregard" of Dawson's rights and the instruction concerning the NASD's rule that a Form U–5 be "accurate and complete." In reviewing a claim that jury instructions were incorrect, we "look to the instructions as a whole, in a common sense manner, avoiding fastidiousness, inquiring whether the correct message was conveyed to the jury reasonably well." *Wilk v. American Med. Ass'n,* 719 F.2d 207, 218 (7th Cir.1983). If the instruction failed to convey the correct message to the jury reasonably well, then we ask whether the misleading instruction prejudiced the complaining party. *See United Airlines, Inc. v. United States,* 111 F.3d 551, 555 (7th Cir.1997); *McLaughlin v. State Farm Mut. Auto. Ins. Co.,* 30 F.3d 861, 868 (7th Cir. 1994), *cert. denied,* 513 U.S. 1149, 115 S.Ct. 1098, 130 L.Ed.2d 1066 (1995). If the misleading instruction did prejudice the complaining party, then the proper remedy is a new trial. *See Heller Int'l Corp. v. Sharp,* 974 F.2d 850, 856 (7th Cir.1992); *Carvel Corp. v. Diversified Management Group,* 930 F.2d 228, 232 (2d Cir.1991).

■ An incorrect instruction calls for a new trial even if the jury could have based its verdict on a different, properly instructed theory. In that situation, "we cannot speculate about which theory the jury chose." *Simmons, Inc. v. Pinkerton's, Inc.,* 762 F.2d 591, 599 n. 3 (7th Cir.1985). When a jury could have based its verdict on either correct or incorrect statements of the law, "its verdict must be set aside even if the verdict may have been based on a theory on which the jury was properly instructed." *Saturday Evening Post Co. v. Rumbleseat Press, Inc.,* 816 F.2d 1191, 1197 (7th Cir.1987) (dicta). We will not assume that the jury decided one way or another. Prejudice to the complaining party includes the possibility that the jury based its decision on incorrect law.

### 1. Reckless Disregard

New York Life defamed Dawson if in filing the Forms U–5 and addressing the assem-bled managers it acted with reckless disregard of Dawson's rights or the consequences to him. *See Kuwik,* 188 Ill.Dec. at 771, 619 N.E.2d at 135. New York Life complains that the district court did not adequately instruct the jury on the meaning of "reckless disregard." Dawson responds first that New York Life did not preserve this argument for appeal and second that the instruction adequately reflected Illinois law.

### a. Objections to Jury Instructions

■ We first address the threshold question of whether New York Life preserved this argument by objecting to the instruction defining "reckless disregard." Fed.R.Civ.P. 51 provides that to appeal an erroneous jury instruction, the complainant must "object[ ] thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection." Fed.R.Civ.P. 51. The objecting party must do more than submit a proposed instruction to the trial court. *See Smith v. Great Am. Restaurants, Inc.,* 969 F.2d 430, 436 (7th Cir.1992); *Shirkey v. Eli Lilly & Co.,* 852 F.2d 227, 230 (7th Cir.1988). But a failure to object in the most specific language will not waive the argument for appeal if the objecting party's position is clear to the judge and further objection would be unavailing. *See Dresser Indus. v. Gradall Co.,* 965 F.2d 1442, 1450 (7th Cir. 1992). Moreover, if the district court judge assured the parties that the record adequately contains their objections, the parties should not be penalized for relying on such assurances, although the more prudent practice is to restate in exacting language the precise objections and the reasons therefor. *See Shirkey,* 852 F.2d at 230–31.

New York Life tendered a proposed instruction that "reckless disregard" means making statements "(i) knowing the statements were false or (ii) despite a high degree of awareness that the statements were false or (iii) despite entertaining serious doubts as to their truth, and then failing to properly investigate the truth." Defendants' Proposed Instruction No. 16, *Dawson,* 932 F.Supp. at 1509 [hereinafter *Dawson Record*]. The court rejected this instruction and

instead provided its own, which stated that "Mr. Dawson may also prove abuse of the privilege by establishing that New York Life engaged in any reckless act that shows a disregard of his rights, including a failure on the part of New York Life to properly investigate the truth of the statements it made about him." Court's Instruction No. 9, *Dawson Record*. New York Life responded to this instruction with a memorandum making clear its displeasure with the way the instruction highlighted one particular way to be reckless—failing to investigate. Defendants' Responses to Questions Raised at the November 14, 1996 Charging Conference, *Dawson Record*. New York Life proposed to modify the court's instruction by deleting the language about failure to investigate and adding a different definition of reckless disregard. The full proposed instruction said, "Mr. Dawson may also prove abuse of the privilege by establishing that New York Life engaged in any reckless act that shows a disregard of his rights. A reckless disregard of the truth exists when there is a high degree of awareness of probable falsity or serious doubt as to the truth of the statement." Defendants' Recommended Changes to Jury Instructions, *Dawson Record*. The court deleted its clause about failure to investigate, but did not adopt New York Life's proposed definition of "reckless." Tr. at 4388. Instead, the court added its own definition of "reckless disregard," that "reckless disregard for his rights and for the consequences that might result to him means that New York Life engaged in any reckless act that shows a disregard for his rights." The court commented that, "I intend to give the instructions as modified right now. . . . Those have overruled the suggestions that you've made that I just do not accept." Tr. at 4370. New York Life did not make any further objections to or comments about the reckless disregard instruction.

The court instructed the jury that:

Mr. Dawson must establish that New York Life acted either with a direct intention to injure Mr. Dawson or with reckless disregard for his rights and for the consequences that might result to him. . . . A reckless disregard for his rights and for the consequences that might result to him means that New York Life engaged in any reckless act that shows a disregard for his rights.

Tr. at 4645–46. After the charge, counsel for Dawson asked, "Your Honor, may I inquire whether it's necessary for us to now repeat, on both sides, our objections to the charge, or can those just stand as—" Tr. at 4650. The court responded, "Those can stand. I think they are in the record as pretty well documented. If there's something in particular—you're free to stand on the charge and the prior record, but if there's something you want to make a record of, I'm not going to preclude you." Tr. at 4650. Counsel for Dawson took advantage of this invitation. New York Life did not.

We are satisfied that New York Life adequately preserved the issue for appeal. First of all, New York Life did more than propose an instruction, *see Smith*, 969 F.2d at 436, and then remain silent when the court rejected its proposal. New York Life submitted a memorandum relating its position on the court's own instructions and proposing modifications to the court's instructions that, if adopted, would have brought the instructions back into line with what New York Life wanted in the first place. Second, at some point further objection became useless. The effect New York Life desired from its many objections was the crafting of an instruction that the court had already rejected. Further objection would have been "unavailing." *Dresser*, 965 F.2d at 1450 (quoting 9 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure*, § 2553, at 640 (1971)). Lastly, after charging the jury the court made it plain that repetitious objections were not necessary. *See Shirkey*, 852 F.2d at 230–31.

Dawson's best argument is that New York Life did not specifically object to the language that the court ultimately read to the jury, that "reckless disregard for his rights and for the consequences that might result to him means that New York Life engaged in any reckless act that shows a disregard for his rights." It is true that New York Life never said, "I object to that tautological definition of reckless disregard" as they do now in their brief. But the record shows that New York Life argued many times from

early in the trial, orally and in writing, that the instructions must include its proposed definition of "reckless disregard" in order to comport with Illinois law. When the basis for the objection is so plainly on the record, as it is here, a party preserves an argument for appeal by objecting that its own instruction was not used—it is not necessary to make a redundant objection to the instruction that was actually used.

### b. Propriety of Reckless Disregard Instruction

■ Having decided that New York Life preserved the issue for appeal, we now turn to the merits of the instructions. New York Life asserts that the district court erred in not giving the instruction that New York Life tendered, or one similar to it. An appellate court may reverse for failure to give a tendered instruction if: the tendered instruction was correct, *see Simmons*, 762 F.2d at 597; the instruction the court gave misinformed the jury, *Wilk*, 719 F.2d at 218; and the misinformation prejudiced the objecting party, *United Airlines*, 111 F.3d at 555. Here, New York Life tendered a correct instruction, but the district court instructed the jury incorrectly, thereby prejudicing New York Life.

■ New York Life tendered a correct instruction which defined reckless disregard as making statements "(i) knowing the statements were false or (ii) despite a high degree of awareness that the statements were false or (iii) despite entertaining serious doubts as to their truth, and then failing to properly investigate the truth." Defendants' Proposed Instruction No. 16, *Dawson Record*. New York Life lifted this language directly from *Kuwik*, 188 Ill.Dec. at 769, 619 N.E.2d at 133. That case noted that, "[r]eckless disregard as to the matter's falseness has been defined in Illinois as publishing the defamatory matter 'despite a high degree of awareness of probable falsity or entertaining serious doubts as to its truth.'" *Id.* (quoting *Mittelman v. Witous*, 135 Ill.2d 220, 142 Ill. Dec. 232, 240, 552 N.E.2d 973, 981 (1989)). *Kuwik* included "the failure to properly investigate the truth of the matter" as one possible way to prove reckless disregard, *id.* 188 Ill.Dec. at 772, 619 N.E.2d at 136, but did

not limit proof of reckless disregard to the failure to investigate.

■ The instruction that the jury ultimately received, that "reckless disregard for his rights and for the consequences that might result to him means that New York Life engaged in any reckless act that shows a disregard for his rights," does not satisfy our standard that instructions must convey the applicable law to the jury reasonably well. *See Wilk*, 719 F.2d at 218. "Recklessness" in general and "reckless disregard" in the defamation context are terms of art that demand careful explanation for the jury. *See Miller v. Neathery*, 52 F.3d 634, 634 (7th Cir.1995) (reversing for failure to define "recklessly"); *United States v. McAnally*, 666 F.2d 1116, 1118 (7th Cir.1981) (reversing for failure to define "reckless disregard"); *Patten v. Smith*, 172 Ind.App. 300, 360 N.E.2d 233, 237 (3rd Dist.1977) (same). Rather than defining the term for the jury, the instruction given did little more than assert that "reckless disregard" means "reckless disregard."

■ Furthermore, the failure to define "reckless disregard" prejudiced New York Life. We realize that the reckless disregard instruction was one of dozens of instructions that the parties hotly debated from the summary judgment stage until the court read the charge to the jury. However, recklessness was the yardstick by which the jury was to measure New York Life's behavior as to all of the statements at issue, including the NASD forms, the managers' meeting, and the videotape. "Reckless disregard" permeated the entire case. Working without a meaningful definition, the jury flew blind during its deliberations and judged all of the statements at issue without the necessary legal guidance. Because New York Life tendered a correct instruction, objected to the incorrect instruction, and suffered prejudice as a result of the instruction used, we must remand this case for a new trial.

### 2. The NASD Rules Instruction

■ The district court also instructed the jury that they could consider NASD rules when deciding whether New York Life acted recklessly towards Dawson. Specifically, the court instructed the jury that:

[t]he NASD does require its members to provide complete and accurate information when they report customer complaints on Forms U–5. To provide complete and accurate information, the Forms U–5 must contain an accurate description of the alleged conduct and, 2, include all relevant information available to the member, including facts that would lend support to or cast doubt on the truth of the allegations.

Tr. at 4636. New York Life argues that this instruction misstated the NASD's rules and prejudiced New York Life in the verdict. Dawson counters that the NASD's interpretation of its own rules, as set forth in its Notices to Members, fully supports the district court's instruction to the jury. We hold that this instruction was incorrect because NASD rules do not require that the forms include "all relevant information" including inculpatory and exculpatory facts, and the misstatement of the rule prejudiced New York Life.

In formulating the instruction, the district court relied on statements of the NASD as published in two Notices to Members. This was proper. We have held in earlier cases that a court may give weight to an exchange's interpretation of its own rules. *See Shultz v. Securities and Exch. Comm'n,* 614 F.2d 561, 571 (7th Cir.1980) ("[B]ecause these are rules of the Exchange, the Exchange should be allowed discretion in determining their meaning."); *Case & Co. v. Board of Trade of Chicago,* 523 F.2d 355, 363 (7th Cir.1975) ("The construction placed upon its own rule by the Board over many years is very persuasive if not controlling."); *see also Fogel v. Chestnutt,* 533 F.2d 731, 752 (2d Cir.1975); *Intercontinental Indus. v. American Stock Exch.,* 452 F.2d 935 (5th Cir.1971); Moses v. *Burgin,* 445 F.2d 369, 382 (1st Cir.1971).

The district court relied on two Notices to Members. The first one, Notice to Members 88–67, provides that:

Member firms are ... required to file *complete and accurate* information on any [Form U–5] that is required to be filed with the NASD.... A "yes" answer to Items 13–15 must be accompanied by a detailed explanation of the apparent misconduct.... The NASD would also point out that members and their associated persons may be subject to administrative, civil, and even criminal penalties for failing to provide *complete and accurate* information on [Form] U–5.

*Dawson v. New York Life Ins. Co.,* 932 F.Supp. 1509, 1537 (N.D.Ill.1996) (emphasis added). The second NASD document that the district court relied on was Notice to Members 89–57, which read in pertinent part:

As in the past, the member is required to exercise *good faith* and to disclose the circumstances of the termination in a manner reasonably designed to inform the NASD and future employers of these circumstances.

*Dawson,* 932 F.Supp. at 1537 (emphasis added). The district court interpreted the italicized language to require the member to provide all relevant information, "whether it be incriminating or exculpatory." *Id.* at 1538. The district court thus concluded that "if the member is aware of any facts that would cast doubt on the truth of the allegations of the complaint, they should be reported as part of the 'detailed explanation of the apparent misconduct.'" *Id.*

We cannot agree with the district court's interpretation of the NASD rules and Notices to Members. First, the structure of the Form U–5 and DRP–5 does not lend itself to a report of "all relevant information" including inculpatory and exculpatory facts. The Form U–5 is a one page form that asks for responses to sixteen questions. The first several questions ask for the name of the terminated agent, the name and address of the firm, and so forth. Most of remaining questions can be answered by checking a box. For example, question twelve is styled, "Reason for Termination: (check one)." Five boxes follow, labeled "voluntary," "deceased," "permitted to resign," "discharged," and "other." Joint Ex. 210, *Dawson Record.* The last three boxes are marked with an asterisk, indicating that the respondent should provide an explanation for the termination on the two lines that follow. Likewise, question thirteen asks several questions about the agent's conduct while at the firm, and gives two boxes labeled "yes" and "no" for the answers. Any "yes" answer triggers

the necessity for a Disclosure Reporting Page, or DRP–5.

The DRP–5 contains nine questions. The form asks for such information as who initiated the event or proceeding being described, when the event or proceeding began, and a docket number if applicable. The DRP–5 also asks, "What were the allegations against the individual? (Include amounts of actual or alleged damages or claims.)." *Id.* The form provides two and a quarter lines for this answer. The largest space is provided for the last inquiry which reads, "You may provide a brief summary of the event or proceeding. (Your information must fit within the space provided.)" *Id.* The DRP–5 provides six lines for this summary.

These forms do not contemplate lengthy and factually balanced answers to their questions. The instructions do not invite the respondent to attach extra pages for development of answers, although the respondent may attach "documents" to the DRP–5 because "regulatory participants may request them as part of the review process in their jurisdiction." *Id.* "Documents" would appear to mean supporting evidence, such as business records, rather than additional sheets with a narrative explanation of events. On the part of the DRP–5 that specifically asks the respondent to describe the event in question, the form instructs that "[y]our information must fit within the space provided." *Id.* Indeed, the NASD submits in its amicus brief that "answers must be complete and accurate *within the confines of the space provided,* however, the forms do not request or require the filing of incriminating or exculpatory information, as a necessary part of the description of the allegations of the complaint." Brief for Amicus Curiae The National Association of Securities Dealers, Inc. at 5, No. 96–4226 (7th Cir. filed March 6, 1997) [hereinafter *NASD Amicus Brief*] (emphasis added).

Not only do the forms not contain space for lengthy exposition of the event in question, but the purpose of the forms is inconsistent with a detailed explanation of the occurrence. The NASD has explained to us that:

> The primary purpose of Questions 12–15 of the Form U–5 and the form DRP–5 is to provide prompt *notice* to federal and state regulatory authorities, self-regulatory or-

ganizations and others that some event has occurred regarding a former employee of the submitting firm that may require a regulatory investigation.... In sum, the information provided in the Form U–5 and DRP–5 is the *starting point* for regulatory review not the sole source of information.

*NASD Amicus Brief* at 4 (emphasis added). Indeed, filing a Form U–5 and DRP–5 with an affirmative answer to one of questions 12–15 triggers an investigation during which the employee in question may submit additional and contrary information. *See id.* Additionally, every NASD member must investigate the background of an employee whom it wishes to register as an agent. Such an investigation will include looking for previously filed Forms U–5 and accompanying Forms DRP–5. *See id.*

Taken together, the structure of the forms, the spaces allotted for answers, and the NASD's own statements that the forms are for notice purposes demonstrate that answers can be "complete and accurate" even if they do not contain all the relevant facts. We cannot agree that in order to be "complete and accurate" the forms must include "all relevant information available to the member, including facts that would lend support to or cast doubt on the truth of the allegations," Tr. at 4636, as the district court instructed. Rather, we agree with the NASD that to be "complete and accurate" the forms need only set out the allegations or bare circumstances of the event in question within the space allotted on the forms themselves. Thus, the jury instruction failed to convey the meaning of the law to the jury reasonably well. *See Wilk,* 719 F.2d at 218.

Furthermore, the misstatement prejudiced New York Life. New York Life concedes that it did not include exculpatory facts about Dawson's termination on the form. The jury, in its analysis of New York Life's conduct, may have determined that New York Life at least violated NASD rules in filling out the Forms U–5 and DRP–5 because it did not include exculpatory facts. Because the district court told the jury that it could consider NASD rules in deciding whether New York Life acted recklessly towards Dawson, the misstatement of NASD rules

could have led the jury down the path to their verdict in Dawson's favor. This faulty instruction and the resulting prejudice to New York Life require a new trial.

For the foregoing reasons, we REVERSE the district court's entry of judgment on all counts on which the jury found for Dawson including the punitive damages count (Count I, Count II, Count III, and the punitive damages count), and we REMAND for a new trial on those counts. We AFFIRM the entry of judgment on the verdict on all counts on which the jury found for New York Life (Count IV and Count V).