**In the Matter of the Arbitration Between Raymond J. ACCIARDO, Sr., Petitioner–Respondent,**

**v.**

**MILLENNIUM SECURITIES CORP., Todd Rome, Richard A. Sitomer, and Pamela L. Rockley, Respondents–Cross–Petitioners.**

No. 99 CIV. 3371(DAB).

United States District Court,
S.D. New York.

Feb. 15, 2000.

Zamansky & Associates, New York City, Jacob H. Zamansky, of Counsel, for Petitioner–Respondent.

Hoffman Pollok & Pickholz, New York City, Marvin G. Pickholz, of Counsel, for Respondents–Cross–Petitioners.

## MEMORANDUM & ORDER

BATTS, District Judge.

Petitioner–Respondent brought this action to confirm an arbitration award granted by the National Association of Securities Dealers, Inc. (the "NASD") pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 9 and 13. The arbitrators awarded compensatory and punitive damages as well as injunctive relief to Petitioner–Respondent Raymond J. Acciardo. Respondents-Cross-Petitioners Millennium, Todd Rome, Richard A. Sitomer, and Pamela L. Rockley seek to vacate this award on the grounds that the arbitrators acted in manifest disregard of the law.

For the reasons set forth below, the Court GRANTS the Petition for Confirmation of Arbitration Award. Respondent–Cross–Petitioners' Cross–Petition to Vacate is DENIED.

## I. BACKGROUND

Millennium Securities Corporation ("Millennium") is a registered broker-dealer with its principal place of business in New York, New York. On April 26, 1996 Respondent Cross–Petitioners Todd Rome ("Rome") and Richard A. Sitomer ("Sitomer"), Millennium's senior management, hired Raymond J. Acciardo ("Acciardo") to serve as Director of Compliance at a yearly salary of $50,000. (Am. Cross–Petition

to Vacate, Ex. J at 1). Before the Arbitration Panel, Acciardo alleged that Rome and Sitomer induced Acciardo to leave his prior position by falsely representing that Millennium had no regulatory problems or customer complaints. (Petition to Confirm, Ex. A at 2). Acciardo further alleged that when he refused to "look the other way" or participate in regulatory frauds proposed by his employers, Pamela L. Rockley ("Rockley") was hired to replace him. (Petition to Confirm, Ex. A at 2).

Acciardo claimed that Rockley, Rome, and Sitomer conspired together to force him out of the firm and punish him by marking his Uniform Termination Statement ("Form U–5") with false and derogatory information, thereby preventing him from finding future employment.[1] (Petition to Confirm, Ex. A at 2). The allegedly defamatory disclosures were that Acciardo was terminated for "failure to perform duties pursuant to NASD 3010,"[2] he was under "internal investigation" because he "removed his personnel files from [the] office," and he was the subject of an arbitration by a dissatisfied customer. (Id. Ex. A at 2 (quoting Acciardo's Form U–5); Zamansky Aff., Ex. A at 1–3). Acciardo testified that as a result of the allegedly false and defamatory statements, he has not been able to find work in the securities industry. (Petition to Confirm, Ex. A at 2). Further, Acciardo claimed that his reputation and career as an attorney and securities compliance officer have been "severely, if not permanently, damaged." (Id.).

The Panel heard testimony from five former Millennium employees.[3] Each tes-

---

1. Stock brokerage firms must file a Form U–5 when an employee is terminated. The forms are a self-regulatory practice designed to protect future employers and customers by notifying employers of past regulatory violations by employment candidates. (Pet.s' Mem. Law at 4).

2. NASD Rule 3010 concerns responsibilities for employee supervision. Resp.'s Mem. Law at 12; Am. Cross–Petition to Vacate, Ex. V.

3. Information on the testimony offered by former employees is drawn from Pet.'s Mem. Law at 12–14. These allegations were not included in the Petition for Confirmation nor were transcripts offered to verify the alleged testimony. However, the Court notes that Respondent–Cross–Petitioners did not dispute Petitioner's rendition of the testimony offered before the Arbitration Panel in its Reply Memorandum. See Resp.'s Reply. Mem. at 1–4

tified that they had observed regulatory violations at the firm.[4] (Pet.'s Mem. Law at 12–14). Three former employees testified that when they left the firm their U–5 Forms were marked with false and derogatory statements. (*Id.*). One former employee testified that she was threatened by Rome and Sitomer that if she made negative comments about the firm, they would issue a false and damaging Form U–5 against her. (*Id.* at 12).

Respondents–Cross–Petitioners ("Respondents") denied all of the above allegations and testified before the Arbitration Panel that they did not fraudulently induce Acciardo to join the firm, nor did they violate any rules, laws or regulations. (Petition to Confirm, Ex. A at 3). Respondents asserted that Acciardo lacked knowledge of the rules and regulations necessary to perform his job adequately and had taken documents from the office without consent. (*Id.*). Respondents maintained that Acciardo's Form U–5 was factually accurate and was not filed with malicious intent. (*Id.*).

Acciardo arbitrated claims for libel and defamation, tortious interference with his employment contract, and wrongful discharge, among others. (Petition to Confirm, Ex. A at 2). NASD arbitrators heard five days of testimony. (*Id.*). On April 7, 1999, the Arbitration Panel rendered its decision and awarded $40,535 to Acciardo in compensatory damages plus pre- and post-judgment interest. Making a specific finding of malice, the Panel awarded Acciardo an additional $100,000 in punitive damages. The arbitrators also ordered Millennium to expunge the U–5 Form so that the "Reason for Termination" reads only "Failure to Perform

Duties" and question 14 (indicating whether the employee was under investigation for employee fraud, wrongful taking of property, or violation of investment-related regulations) reads "no". (*Id.* at 4).

Acciardo then filed a petition in this Court to confirm and enter judgment on the arbitration award. On June 2, 1999 Millennium and the individual Respondents filed the instant Cross–Petition to Vacate the award of the arbitrators pursuant to 9 U.S.C. § 10, alleging the arbitrators, *inter alia,* manifestly disregarded the law.

By Order dated November 10, 1999, this Court remanded the matter to the Arbitration Panel for clarification of its award. Specifically, this Court sought further explanation of the blanket $40,535 compensatory damage award on the grounds that some understanding of the purpose of the compensatory award was necessary to evaluate the propriety of the Panel's punitive damage award. *See* Remand Order (citing *Action House, Inc. v. Koolik,* 54 F.3d 1009 (2d Cir.1995)). *See also Conn-Tech Dev. Co. v. University of Conn. Educ. Prop.,* 102 F.3d 677 (2d Cir.1996) (approving remand of lump sum arbitration awards for clarification where the award appears to be the result of precise mathematical calculations).

The Arbitration Panel, by letter dated December 23, 1999, elaborated on its $40,535 compensatory damages award as follows:

1. Compensatory damages for breach of contract, consisting of six months pay: $32,500;

2. Compensatory damages for breach of contract, two weeks severance plus

---

(offering evidence of additional testimony tending to discredit two former employee witnesses but not denying that the Panel heard the alleged testimony as described by Petitioner–Respondent). The Court makes no finding as to the truth of any of the alleged testimony but merely notes that these were facts upon which the Arbitration Panel may have based its decision.

4. Glenn Monroe, a former Millennium Compliance Officer, testified that the firm had more customer and regulatory complaints "than he had ever seen." (Pet.'s Mem. Law at 12).

funds for medical benefits, lost vacation and pension contributions; $3,035;

3. Compensatory damages for the tort of defamation: $5,000

*See* Taube Ltr dated December 23, 1999.

By letter brief dated January 3, 2000, Respondents filed supplemental arguments in support of their Motion to Vacate based on the newly clarified award. *See* Pickholz Ltr dated Jan. 3, 2000.[5]

## II. DISCUSSION

### A. Judicial Review of Arbitration Awards

Review of an arbitration award is generally governed by the Federal Arbitration Act (the "FAA"). The FAA provides that an arbitration award may be vacated if: (1) the award was procured by corruption, fraud or undue means; (2) the arbitrators exhibited "evident partiality" or "corruption"; (3) the arbitrators were guilty of misconduct; or (4) the arbitrators exceeded their power. *See* 9 U.S.C. § 10.

■ In addition, the Second Circuit has recognized that an arbitration award may be vacated if it is rendered in "manifest disregard of the law." *Halligan v. Piper Jaffray, Inc.,* 148 F.3d 197, 201–202 (2d Cir.1998); *Wilko v. Swan,* 346 U.S. 427, 436–37, 74 S.Ct. 182, 98 L.Ed. 168 (1953). However, the "manifest disregard" doctrine is "severely limited." *Government of India v. Cargill, Inc.,* 867 F.2d 130, 133 (2d Cir.1989) (quoted in *Halligan,* 148 F.3d at 202). It requires "something beyond and different from a mere error in the law or failure on the part of the arbitrators to understand or apply the law." *Siegel v. Titan Indus. Corp.,* 779 F.2d 891, 892 (2d Cir.1985) (quoted in *Willemijn Houdstermaatschappij, BV v. Standard Microsystems Corp.,* 103 F.3d 9, 12 (2d Cir.1997)).

■ To modify or vacate an award on the ground that arbitrators acted in mani-

fest disregard of the law, a court must find that: "(1) the arbitrators knew of a governing legal principle yet refused to apply it or ignored it altogether, and (2) the law ignored by the arbitrators was well defined, explicit, and clearly applicable to the case." *Halligan,* 148 F.3d 197, 202 (citing *DiRussa v. Dean Witter Reynolds Inc.,* 121 F.3d 818, 821 (2d Cir.1997), *cert. denied,* 522 U.S. 1049, 118 S.Ct. 695, 139 L.Ed.2d 639 (1998)). "The party seeking to vacate or modify an arbitration award bears the burden of proof, and the showing required of that party in order to avoid summary affirmance of the award is high." *DeGaetano v. Smith Barney, Inc.,* 983 F.Supp. 459, 461 (S.D.N.Y.1997).

■ In addition, the Court is not empowered to second-guess the arbitrators' fact-finding or assessment of credibility. *See International Bhd. of Elec. Workers v. Niagara Mohawk Power Corp.,* 143 F.3d 704, 706, 725–26 (2d Cir.1998) (holding that arbitrators' fact-finding cannot be reviewed *de novo* by district court). A district court must accept findings of fact if they are not clearly erroneous. *ConnTech,* 102 F.3d at 686 (citing *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 115 S.Ct. 1920, 1926, 131 L.Ed.2d 985 (1995)).

### B. The Compensatory Damages Award for Wrongful Disharge

The Arbitration Panel awarded Acciardo $40,535 plus pre- and post-judgment interest at seven (7) percent per annum. The Panel further clarified that Acciardo was to be compensated $32,500 for six months missed salary, $3,035 for benefits and severance, and an additional $5,000 for defamation. The Panel clearly states that the compensatory award is principally grounded on a finding of breach of contract thus supporting an inference that the Panel credited Acciardo's claim of wrongful discharge.

---

5. Although Petitioner objected to Respondents "unauthorized" letter (*See* Zamansky Ltr dated Jan. 4, 2000), the Court will consider Respondents' new arguments because they address issues raised by the Panel's newly clarified award and were thus impossible to foresee when submitting their initial filing.

Respondents argue that the award must be overturned because Acciardo was an employee-at-will and thus terminable at any time. *See Rooney v. Tyson,* 91 N.Y.2d 685, 689, 674 N.Y.S.2d 616, 697 N.E.2d 571 (1998) (holding "absent an agreement establishing a fixed duration, an employment relationship is presumed to be a hiring at will, terminable at any time by either party."). Resolution of Acciardo's employment status required interpretation of contractual provisions contained in an ambiguous "Memorandum of Understanding;" later "renewed for another year" via an "Employment Agreement" effective April 1, 1997. *See* Am. Cross–Petition to Vacate, Ex. K and Ex. T. Interpretation of contracts is "a task well within the domain of the arbitrators." *Siegel v. Titan Indus. Corp.,* 779 F.2d 891, 894 (2d Cir.1985).

The Panel awarded Acciardo "six months pay," Taube Ltr at 1, thus supporting Petitioner's allegation that he was terminated in October 1997, six months after the effective date of the "Employment Agreement." *See* Am. Cross–Petition to Vacate, Ex. T,; Pet.'s Mem. Law at 19. "So long as some ground for the arbitrators' award can be inferred from the facts of the case, the award should be confirmed." *See ConnTech,* 102 F.3d 677, 686 (internal quotations omitted). It is reasonable to infer on these facts that the Arbitration Panel considered the disputed employment agreements and determined that Acciardo had a valid employment contract spanning a specific period of employment, thus making *Rooney* inapplicable.

Respondents next argue that the Panel's direction to note Acciardo's reason for discharge on the Form U–5 as "failure to perform duties" is evidence of the Panel's finding that Acciardo was discharged for cause. Respondents argue that because the Panel allegedly found the discharge to be justified, Acciardo is not entitled to unearned wages. The Court does not agree.

The Panel made no specific finding that Acciardo was fired for cause.[6] Even following the reasoning proposed by Respondent, under long settled New York State law, to bar recovery for wrongful discharge, an employee's act must be "misconduct and unfaithfulness which substantially violates the contract of service." *Turner v. Konwenhoven,* 100 N.Y. 115, 120, 2 N.E. 637 (1885). The arbitrators made no specific finding on the nature or severity of Acciardo's "failure to perform duties," if any. Thus this Court can not conclude that the Arbitration Panel manifestly disregarded the law in awarding Acciardo compensatory damages for wrongful discharge.

## C. Awards for Defamation

Respondents contend that the Panel's award of $5,000 in compensatory damages and $100,000 in punitive damages for defamation must be set aside because, they argue, both awards were made in manifest disregard of New York State defamation law.[7] Respondents contend that state-

---

**6.** Respondents argue that this apparent inconsistency, granting unearned wages while permitting some negative comments to remain on the U–5, requires a remand to the Arbitration Panel to clarify its findings. This Court understands the Panel's finding, though somewhat inconsistent, to reflect the Panel's view that neither party was entirely without fault. Ample evidence in the record presented to the Panel supports this reading. *See e.g.,* Am. Cross–Petition to Vacate, Hearing Testimony, Ex. F at 1226–27 ("Q. What was the reason [Acciardo] got terminated? A. It could have been the skirt chasing ... It could have been

the Hawaiian luau shirts in the middle of the business day.").

**7.** The Arbitration Panel made no indication of the basis for its punitive damage award. However, the Panel did grant $5,000 in compensatory damages for the tort of defamation. In addition, the Panel cited *Miklautsch v. Sears, Roebuck and Co.* in support of its punitive damage award. No. 97 Civ. 2708, 1998 U.S. Dist. LEXIS 18828, 1998 WL 846122 (S.D.N.Y Dec. 2, 1998).

In *Miklautsch,* the court concluded that under New York law, defamation and tortious interference with contract claims require a

ments made on a Form U–5 are cloaked with absolutely immunity and that, in any case, the statements were truthful, which constitutes a complete defense to a defamation claim.

### 1. *Form U–5 Immunity*

█ The issue of qualified versus absolute immunity for statements made on an employee's Form U–5 is a hotly contested issue in the securities industry. *See* Zamansky Aff., Ex. C (Evan J. Charkes, "Qualified Privilege for the Form U–5,", *N.Y.L.J.*, March 19, 1998 at 1). The NASD requires stock brokerage firms to file a Form U–5 when an employee is terminated. *Fahnestock & Co. v. Waltman*, 935 F.2d 512, 514 (2d Cir.1991). The form is designed to protect a new firm and its customers from hiring a person who has exhibited a disregard for industry regulations or policies at the former firm. Pet.'s Mem. Law at 4. However, derogatory or false Form U–5 statements can effectively "blackball" a broker from the industry. *See* Zamansky Aff., Ex. B (Michael Siconolfi, " 'Blackballing' of Brokers is Growing on Wall Street," *Wall St. J.*, February 27, 1998 at C1 ("Wall Street firms seem to have found a new weapon in battling brokers and branch managers who ruffle feathers: termination notices.")).

In recent years, courts have overwhelmingly granted Form U–5 statements qualified, rather than absolute, immunity.[8] Qualified immunity serves the industry purpose while protecting the interests of the employee. Recently, the Seventh Circuit concluded that "wiser policy leads to the conclusion that a qualified privilege adequately protects the interests of all parties concerned." [9] *Dawson v. New York Life Insurance Co.*, 135 F.3d 1158, 1164 (7th Cir.1998). Under a qualified immunity standard, the employee has the opportunity to dissolve the immunity if she can demonstrate that the former employer spoke with malice. *See Liberman v. Gelstein*, 80 N.Y.2d 429, 437, 590 N.Y.S.2d 857, 605 N.E.2d 344 (1992). If malice is shown, the defamation action may proceed.

Against this backdrop, the parties in the instant action presented the Arbitration Panel with conflicting legal precedents in New York.[10] Respondents argued that it is *well settled* New York law that statements on a Form U–5 enjoy absolute immunity, citing *Herzfeld & Stern, Inc. v. Beck*, 175 A.D.2d 689, 572 N.Y.S.2d 683 (1st Dept. 1991), *appeal dismissed*, 79 N.Y.2d 914, 581 N.Y.S.2d 666, 590 N.E.2d 251 (1992) and *Culver v. Merrill Lynch & Co.*, No. 94 Civ. 8124(LBS), 1995 WL 422203 (S.D.N.Y. 1995) (finding statements on Form U–5 are absolutely immune from liability under New York law and dismissing diversity

---

showing of malice. *Id.*, at *9–11, 1998 WL 846122. Punitive damages for tortious interference with contract are here precluded as no compensatory award was granted. *See Action House, Inc. v. Koolik*, 54 F.3d 1009 (2d Cir.1995) (finding compensatory damages to be a predicate to an award of punitive damages). Thus, having made an explicit finding of malice and granting a compensatory award for defamation, it is reasonable to infer that the punitive damages award was responsive to Acciardo's defamation claim.

**8.** *See Dawson v. New York Life Insurance Co.*, 135 F.3d 1158 (7th Cir.1998); *Glennon v. Dean Witter Reynolds, Inc.* 83 F.3d 132 (6th Cir.1996); *Andrews v. Prudential Securities*, slip op. (E.D.Mich. Jan. 6, 1997); *Eaton Vance Distributors, Inc. v. Ulrich*, 692 So.2d 915 (Fla.Dist.Ct.App.2d Dist.1997); *Pruden-*

tial *Securities, Inc. v. Dalton*, 929 F.Supp. 1411 (D.Okl.1996); *Haburjak v. Prudential-Bache Securities, Inc.*, 759 F.Supp. 293 (W.D.N.C.1991).

**9.** *See also*, Anne H. Wright, *Form U–5 Defamation*, 52 Wash. & Lee L.Rev. 1299 (1995) (reviewing U–5 defamation case law and policy considerations).

**10.** Petitioner and Respondents presented contradicting arguments on the applicable law in both Hearing Memoranda of Law and in testimony. Am. Cross–Petition to Vacate, Ex. F at 1364–65, Ex. X; Resp.'s Mem. Law at 20, Pet.'s Mem. Law at 19.

Respondents also cite to hearing transcript pages 1361–63, although these were not included in Respondents' exhibits.

defamation suit).[11] Thus, argued Respondents in their Memorandum of Law to the Arbitration Panel, Petitioner's defamation claim was substantively barred. Am. Cross–Petition to Vacate, Ex. X. at 3.

■ Conversely, Petitioner pointed to Second Circuit law interpreting New York law and reaching the opposite conclusion. The Second Circuit ruled in *Fahnestock & Co. v. Waltman* that statements on the Form U–5 enjoyed only qualified immunity and could be "vitiated upon a showing that the communication was made with actual malice." 935 F.2d 512, 516 (2d Cir.1991) (upholding an arbitration award for U–5 defamation). The Second Circuit also noted with approval that the arbitrators in the original proceeding had "declined to extend the doctrine of absolute immunity" to statements made on the Form U–5. *Id.* Thus, argued Petitioner, a defamation claim could stand assuming the Panel made a finding of malice to destroy the qualified immunity defense.

Respondents insist that the absolute immunity standard articulated in *Herzfeld*, decided fewer than two months after *Fahnestock*, is controlling law in New York and was binding on the arbitrators. Respondents clearly made the Arbitrators aware of the *Herzfeld* decision but apparently did not address the applicability of *Herzfeld* given the conflicting Second Circuit case.[12] It is evident, by the Panel's defamation awards, that the Panel did not find *Herzfeld* controlling.

Nor does this Court agree that a single New York Appellate Division ruling is necessarily controlling over a Second Circuit Court of Appeals decision interpreting New York law. *See Pahuta v. Massey–Ferguson, Inc.,* 170 F.3d 125, 134 (2d Cir. 1999) (requiring federal courts to apply intermediate appellate court rulings absent persuasive evidence to suggest that the New York Court of Appeals would reach a different conclusion). Given the general controversy and weight of conflicting case law, there is ample evidence to suggest that New York's highest court may some day reach a different conclusion on Form U–5 immunity. However, there is no need for this Court to make an independent legal conclusion on the substantive law.

The limited purpose of this motion is to determine whether the arbitration award will be set aside for manifest disregard of the law. An award will be vacated only where a court determines the panel clearly knew of and ignored a governing legal principle, which was "well defined, explicit, and clearly applicable to the case." *Halligan,* 148 F.3d 197, 202 (internal citations omitted). Given the conflicting case law from the Second Circuit and elsewhere, coupled with the failure to brief the arbitrators on the complex choice of law issues, the Court concludes that the *Herzfeld* rule was not a "governing legal principle" within the meaning of the manifest disregard doctrine. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bobker,* 808 F.2d 930, 934 (2d Cir.1986) ("We are not at liberty to set aside an arbitration panel's award be-

**11.** By letters to this Court dated December 20, 1999 and January 3, 2000, Respondents also cite to the recent New York lower court decision, *Grieve v. Barclays Capital Securities, Ltd.,* decided after the Arbitration Panel's deliberation. Slip. Op., (Sup.Ct.N.Y.Co. Sept. 10, 1999) (dismissing a Form U–5 defamation claim on absolute immunity grounds and finding *Herzfeld* controlling despite contrary precedents in other jurisdictions).

**12.** Respondents' Reply Hearing Memorandum presumed without briefing, that *Herzfeld* was the controlling law for the arbitrators. Am. Cross–Petition to Vacate, Ex. X. The rec-

ord before this Court contains no evidence that Respondents addressed the choice of law issue before the Arbitration Panel. Respondents' position is frustrated by their two time failure to attach transcript pages 1361–63 to their moving papers. Though cited in Respondents' Memorandum of Law as evidence that the arbitrators' were apprised of the *Herzfeld* precedent, Resp.'s Mem. Law at 20, Respondents' did not remedy their failure to attach the pages even after it was brought to their attention by the Court. The Court can only conclude that the pages cited do not support Respondents' position.

cause of an arguable difference regarding the meaning or applicability of laws urged upon it."). *See also Park v. First Union Brokerage,* 926 F.Supp. 1085, 1089 (M.D.Fla.1996) (finding that when an arbitration award is challenged for manifest disregard of state law, the mere fact that two inferior courts decided the issue in opposite ways "totally vitiates any potential 'manifest disregard' or 'wholesale departure' from the law.").

For the same reasons, the Court concludes that the *Herzfeld* rule is not "well defined, explicit, and clearly applicable to the case," such that the arbitration award must be vacated for manifest disregard of the law. *Halligan,* 148 F.3d at 202. Manifest disregard of the law requires that the error be "obvious and capable of being readily and instantly perceived by the average person qualified to serve as an arbitrator." *Merrill Lynch,* 808 F.2d at 933. The complex issues raised by the conflicting legal sources and controversial debate over U–5 defamation make the Arbitrators' error, if any, far from obvious.

### 2. *Malice*

Under *Fahnestock*'s qualified immunity standard, a Form U–5 defamation claim can only be granted upon a finding that the statements were made with malice. 935 F.2d 512, 516. *See also, Liberman v. Gelstein,* 80 N.Y.2d 429, 437, 590 N.Y.S.2d 857, 605 N.E.2d 344 (1992) ("The shield provided by a qualified privilege may be dissolved if plaintiff can demonstrate that defendant spoke with 'malice' "). Accordingly, the Panel made an explicit finding that Respondents acted with malice. (Petition to Confirm, Ex. A at 4).

Before this Court, Respondents first argue that the Panel's finding of malice must be overturned because there was not enough evidence to support such a finding. However, the Arbitration Panel's finding of malice is a question of fact, unreviewable on a motion to vacate absent clear error. *See Fahnestock & Co., Inc. v. Waltman,* No. 90 Civ. 1792, 1990 WL 124354

(S.D.N.Y. Aug. 23, 1990), *aff'd* 935 F.2d 512 (2d Cir.1991); *ConnTech,* 102 F.3d 677, 686.

Alternatively, Respondents argue that no malice could be found if, as Respondents assert, Petitioner was discharged for cause. For the reasons previously stated, this argument must fail. Considering the testimony presented to the Panel, the Panel's finding of malice was not clear error.

### 3. *Truth*

Finally, Respondents argue that the defamation awards should be overturned because the statements made on the Form U–5 were substantially true. Resp.'s Mem. Law. at 21. Respondents contend that "substantial truth" is an absolute defense to a claim of libel. *See Masson v. New Yorker Magazine,* 501 U.S. 496, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991).

The Court notes that the amendments ordered by the Arbitration Panel were significant. The new Form U–5 as amended would state only that Acciardo was terminated for "failure to perform duties" and that he was the subject of a consumer-initiated complaint. The Panel ordered Respondents to excise an allegation that Acciardo failed to perform his supervisory duties. The Panel also ordered deletion of a statement that Acciardo was under an internal investigation for fraud, wrongful taking of property, or regulatory violations. Based on the amendments ordered by the Panel, it is clear that the Panel did not find the statements on the original Form U–5 to be substantially true. Thus, the Panel did not act in manifest disregard of the law in awarding damages based on the defamatory statements.

The Court finds the Panel's application of a qualified immunity standard and award of damages for defamation were not made in manifest disregard of applicable law.

### D. The Punitive Damages Award

Making a specific finding that Respondents acted with malice, the Arbitration Panel awarded Acciardo $100,000 in punitive damages with post judgment interest of seven (7) percent per annum. The Panel held Respondents Millennium, Rome, and Sitomer jointly and severally liable for the full $100,000 punitive award and Respondent Rockley jointly liable for $5,000 of punitive damages.

Respondents argue by supplemental letter brief that, even if a defamation award is permissible, the punitive damages award granted by the Panel is excessive and overly burdensome under the circumstances. Respondents point to the lack of proportionality between the compensatory and punitive awards and to the alleged failure of the Arbitration Panel to consider Respondents' ability to pay in support of their Motion to Vacate the punitive damages award.

The Panel clearly had authority to grant punitive damages. *See Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995). Respondents contend that the Arbitration Panel acted in manifest disregard of the law because the punitive damages award was excessive. The Supreme Court has identified three "guideposts" to assist in assessing the validity of a punitive damages award: (1) the degree of reprehensability of the defendant's conduct; (2) the ratio of punitive damages to compensatory damages; and (3) a comparison of the civil penalty to the comparable criminal penalties available. *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 575–85, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996).

Respondents' principal argument is that the award violates due process because the ratio between punitive and compensatory damages renders it excessive. Pickholz Ltr., Jan. 3, 2000 (citing *BMW*). The Arbitration Panel granted $100,000 in punitive and $5,000 in compensatory damages, this is effectively a 20 to 1 ratio. As the Supreme Court cautioned in *BMW*, "we have consistently rejected the notion that the constitutional line is marked by a simple mathematical formula." 517 U.S. at 582, 116 S.Ct. 1589 (internal quotations omitted). The Court declines to apply such a rigid rule here. This is especially true given the relatively small compensatory award. *See id.* ("Indeed, low awards of compensatory damages may properly support a higher ratio than high compensatory awards").

The Panel heard testimony suggesting that Respondents had engaged in repeated, malicious and vindictive misuse of its employees' U–5 Forms. The behavior is reminiscent of the "blackballing" complained of by some in the securities industry. *See supra.* The Panel made a specific finding of malice and was within its authority in granting a $100,000 punitive damage award.

Finally, Respondents suggest that the Panel acted in manifest disregard of the law by failing to ascertain their ability to pay before imposing punitive damages. The Court notes that, although they have long had notice of the $100,000 award, Respondents raised this argument for the first time in their letter brief of January 3, 2000. This suggests that the argument may be disingenuous. In addition, Respondents offered no verification of their inability to pay.

It is true that the financial standing of the defendant should be considered before imposing punitive damages. *TXO Production Corp. v. Alliance Resources Corp.*, 509 U.S. 443, 463, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993). Arbitrators have also been encouraged to consider the ability to pay in making large punitive awards. *See, e.g., Daily News, L.P. v. Newspaper & Mail Delivers' Union of New York*, No. 99 Civ. 5165(TPG), 1999 WL 1095613 (S.D.N.Y. Dec.2, 1999) (remanding to arbitrators to determine newspaper's ability to pay $3.5 million in wage increases). On the record before this Court, it is not clear whether the Arbitrators considered Respondents'

ability to pay when awarding punitive damages. However, even if the Panel did ignore Respondents' financial standing, the Panel's joint and several award of $100,000 against three securities industry professionals and a securities business, if error, was not so obvious or egregious as to require overturning the award.

The Court has considered Respondents' other arguments and finds them to be without merit.

### III.  CONCLUSION

For the reasons stated above, the Court GRANTS Petitioner–Respondent Acciardo's Petition for Confirmation of Arbitration. Respondent–Cross–Petitioners' Cross–Petition to Vacate is DENIED in its entirety.

SO ORDERED.